UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEAN SCHEU,<br><br>    Plaintiff,<br><br>    vs.<br><br>CHARTER COMMUNICATIONS, LLC,<br><br>    Defendant. | CASE NO. CV 08–02835 MMM (CWx)<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS LAW |

On March 25, 2008, plaintiff Dean Scheu filed a complaint for wrongful termination in violation of public policy in Los Angeles Superior Court against defendants Charter Communications, LLC ("Charter") and Derek Hanson.[1]  On April 30, 2008, Charter removed the action to this court, invoking the court's diversity jurisdiction.  On June 3, 2008, Scheu filed a first amended complaint, again alleging wrongful termination in violation of public policy against

---

[1]Complaint for Damages for: 1. Wrongful Termination in Violation of Public Policy, attached as Exh. B to Defendant Charter Communications, Inc.'s Notice of Removal of Civil Action to Federal Court ("Notice of Removal") , Docket No. 1 (Apr. 30, 2008).

Charter and Hanson.[2]  He voluntarily dismissed Hanson as a defendant on August 5, 2008, pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure.[3]

On March 2, 2009, the court denied defendant's motion for summary judgment.[4]  It found that California Labor Code § 1102.5 and Business & Professions Code § 17200 were proper statutory predicates for Scheu's wrongful termination claim,[5] and that triable issues of fact remained as to whether Scheu's termination was retaliatory.[6]

The case was tried to the court from June 8 to 11, 2010.  Thereafter, the parties submitted written trial briefs.  Having considered the evidence presented, the arguments of counsel, and the parties' trial briefs, the court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I.  FINDINGS OF FACT

### A.  Scheu's Background Before Commencing Work at Charter

1.  Dean Scheu attended college at Pace University in New York City, New York and graduated in 1983 with a degree in media relations and a minor in finance.  During college, Scheu worked for the New York Giants, a National Football League team, in media relations.  After college, he worked for Kroy Lettering, a technology company also located in New York City.  Following his employment with Kroy Lettering, Scheu joined the

---

[2]First Amended Complaint for Damages for: 1. Wrongful Termination in Violation of Public Policy ('FAC"), Docket No. 23 (June 3, 2008).

[3]Notice of Dismissal, Docket No. 27 (Aug. 5, 2008).

[4]Order Denying Defendant's Motion for Summary Judgment ("MSJ Order"), Docket No. 45 (Mar. 2, 2009).

[5]*Id.* at 15–20.

[6]*Id.* at 21.

account executive program at Petry Television.[7]

2. Subsequent to his employment with Petry Television, Scheu went to work at KTLA in Los Angeles, California. While at KTLA in the late 1980s, Scheu was involved in an unspecified capacity with the then-new technology called SAP, which permits a viewer to choose between English- and Spanish-language audio.[8]

3. At some point subsequent to his employment at KTLA, in or about 2004, Scheu worked for Comcast. He first held the title of "account executive"; thereafter, he held the title of "account manager."[9] At Comcast, Scheu had local responsibility for selling thirty-second spots on cable television. He received a "VIP award for exceeding revenue" and was nominated for the "President's Club" for his sales of sports sponsorships.[10] Scheu testified that Comcast's regional vice president gave him additional responsibility for marketing Internet advertising for Comcast.[11] He "was [also] involved in a lot of . . . discussions" regarding the roll-out of Video on Demand ("VOD") at Comcast.[12] Scheu described his role in preparing "marketing strategy plans" as a "leadership role," albeit one that was not "formalized."[13]

4. Derek Hanson worked for Charter Communications from 2003 to September 2007 as its

---

[7]RT at 24:10–18, 25:5–8. Kroy Lettering sold a "computerized lettering system." The company was eventually purchased by 3M. (RT at 24:23–25, 25:1.)

[8]RT at 25:13–20.

[9]*Id.* at 25:24–25, 26:1.

[10]*Id.* at 26:3–7.

[11]*Id.* at 26:8–10. Scheu testified that he sold Internet advertising, such as banner advertising, for Comcast's online properties. (*Id.* at 26:11–14.)

[12]*Id.* at 26:17–18.

[13]*Id.* at 26:19–23 ("Q. And did you prepare some marketing strategy plans for Comcast while you were employed there? A. I was – I had a leadership role. It wasn't as formalized as that, but I did work with some of the advanced media specialists on some of the strategy").

vice president of sales, western division.[14]  In that capacity, Hanson oversaw all aspects of Charter's media operations in thirteen states, including sales, operations, marketing and finance.[15]  Eight employees reported to Hanson during the time Scheu was employed: Scheu, Mike Welsh, Gail Scott, Pamela Chiu, Shelly Blumquist, Craig Ruble, Mike Szczechura, and Chuck Holdridge.[16]  Hanson described his management style as follows: "[H]ire good people, put them to work, give them room to work, and check in with them periodically to make sure that we are [making] progress."[17]  Hanson conducted weekly one-on-one meetings with each employee reporting to him, during which he and the employee "discuss[ed] key elements of their job operation[ ] [and the] metrics by which we were [evaluating] their performance and their team's performance."[18]

5.  Scheu testified that he first met Derek Hanson at a golf outing in late 2005 sponsored by the Southern California Cable Association.[19]  Hanson, however, testified that he and Scheu first met at an interview conducted at a Marie Callender's restaurant.[20]  Whichever is the case, both Scheu and Hanson agree that they had a number of meetings, including at least

[14]*Id.* at 194:15–22; *id.* at 234:6–7.

[15]*Id.* at 234:9–11.

[16]*Id.* at 236:21-24.

[17]*Id.* at 237:25, 238:1–2.

[18]*Id.* at 238:5–8.

[19]*Id.* at 27:1–3. See also *id.* at 6–12 ("I remember that I was with somebody, and I don't know if it was a Charter employee, but I was explaining what I was doing over at Comcast in Los Angeles, and at that point they said, 'Oh, you have to meet Derek. He's looking for somebody possibly with your skill sets.'  And we started a conversation, and I explained to him my background and what I was doing at Comcast").

[20]*Id.* at 195:6–15 ("Q. And you initially met him at an industry golf outing. Is that accurate? A. No. Q. Where did you meet him? A. I met him at a restaurant conducting an interview. Q. And that's your recollection that that was the first time you had an opportunity to meet him? A. Yes. Q. And what restaurant were you at? A. I believe it was the Marie Callender's").

one at a restaurant, as well as telephone calls and e-mail exchanges.[21]   During the
meetings, Hanson asked about Scheu's experience, including his experience at Comcast.[22]
Scheu developed an understanding that Hanson was looking for someone with experience
in Internet advertising.[23]   He also met with other Charter employees, including on another

---

[21]*Id.* at 27:15–17 ("Yes, we had quite a few follow-up meetings.  We had a lunch in Long
Beach.  We had numerous telephone calls and E-mail exchanges as well, too").

[22]*Id.* at 27:21–25, 28:1–4 ("Q. And during those meetings, did Mr. Hanson ask you about
your work at Comcast?  A. Yes, he did.  He asked what I did.  You know, Derek also worked
at Comcast.  So he knew everybody at Comcast.  So it wasn't like it was an alien company.  He
was very familiar with the management at Comcast and where I came from, and I explained to him
what I was doing over there in regards to the banner advertising and having the only responsibility
for that in the L.A. marketplace"); *id.* at 28:11–14 ("I described how I got the position of doing
the interactive – had the distinction of doing the interactive advertising with him. I did – and he
noted who those people were, and he knew who they were"); *id.* at 29:24–25, 30:1–4 ("Q. Were
the discussions that you had with Mr. Hanson, before your employment with Charter, were they
in your point of view informal discussions, or was Mr. Hanson truly inquiring as to your skills
and abilities?  A. He was truly inquiring about my skills and abilities.  He really was asking very
good questions, and I was providing him what I felt was very good feedback"); *id.* at 30:7–9 ("I
don't know if we met personally more than five times, but it was at least three, three to four times,
and then we had telephone conversations, and we did exchange E-mails"); *id.* at 195:21–25,
196:1–5 ("Q. And did you in fact conduct a job interview at that time with Mr. Scheu?  A. Yes.
Q. Did you ask Mr. Scheu about his past background?  A. Yes.  Q. Did you ask him about where
he went to school and what degrees he obtained?  A. Yes.  Q. Did you ask him about his past
work experience?  A. Yes"); *id.* at 196:19–25, 197:1–5 ("Q. During both of those meetings, did
you ask Dean about his work background?  A. Yes.  Q. And were you informed that he worked
over at Comcast?  A. Yes.  Q. And through your employment in the industry, did you know a
number of individuals who worked as executives over at Comcast?  A. Yes.  Q. And did Dean
tell you a little bit about what he was doing over at Comcast?  A. Yes, he did"); *id.* at 198:6–23
("Q. Following your meetings with Dean, did you have the belief that Dean could carry out the
types of obligations and duties that you saw for him at Charter?  A. Based on his representations,
yes.  Q. Well, did you ask him questions about what he did at Comcast?  A. Yes.  Q. And did you
ask him – did he tell you that he was in marketing?  A. He told me a number of activities that he
was engaged in.  Q. Okay.  And did you inquire about those activities?  A. Of him, yes.  Q. And
did Dean respond to those activities – or those inquiries that you made?  A. Yes.  Q. Did you feel
comfortable that he would be able to fit the position that you were creating over at Charter?  A.
Yes").

[23]*Id.* at 29–25 ("We talked about a lot of things.  And he was looking for somebody that
had experience with Internet advertising because a lot of what Navic had, functionality, had a lot

5

1     golf outing.[24]

2  6.    Hanson testified that he interviewed Scheu twice at the same Marie Callender's restaurant,

3     with each meeting lasting approximately one hour.[25]  At these meetings, Hanson described

4     the new position Charter was creating, and stated that the employee he hired would be

5     responsible for the rollout of "Advanced Media" products.[26]  Hanson recalls that Scheu

6     then met a colleague of Hanson's, Todd Stewart, Charter's vice-president for Advanced

7     Media, at an industry golf outing.[27]  He testified that Scheu was also introduced to Craig

8     Ruble[28] and Paul Sly, who were Charter employees.[29]  Finally, Hanson asked that someone

9     talk to the people at Comcast regarding Scheu's employment as part of a standard

10     background check.[30]

_____

12 to do with active advertising, also some Video on Demand experience which I had as well, too").

13     [24]*Id.* at 30:13–20 ("Q. And did you have an opportunity to meet face to face with some of
those executives?  A. Yes, he invited me to go on a golf outing with Charter executives, which
I met with all of – a great deal of them, especially in the L.A. area, and Stewart Scott, who was
a national sales manager heading up this initiative, too, along with Derek.  I had an opportunity
to play golf with him for a full round").

17     [25]*Id.* at 196:10–21.

18     [26]*Id.* at 197:10–13 ("I described a role that we were posting for a director of Advanced
Media, that this was a new position, and that this new position would be responsible for the rollout
of Advanced Media products").

20     [27]*Id.* at 197:20–25 ("He met a colleague of mine at a golf function, which may have been
what you referred to before.  He met Todd Stewart, who was our vice-president of Advanced
Media I believe his title was.  So he would be an associate dean, if you will, from a corporate
perspective.  And I met him at that point because I wanted his opinion as well on Dean's
qualifications").

24     [28]Craig Ruble was, at the time, vice president of sales for Los Angeles.  (*Id.* at 237:1–2.)

25     [29]*Id.* at 198:4–5.

26     [30]*Id.* at 199:24–25, 200:2–16 ("Q. Did you, yourself, talk to anyone over at Comcast?  A.
I did not. . . . Q. Did you yourself – did you ask anyone at Charter to talk to anyone at Comcast
about what Dean was doing over there?  A. Yes.  Q. And to your understanding did they in fact
communicate with Comcast to find out what type of work Dean was doing with Comcast?  A.

7. Scheu gave Charter a resume on December 5, 2005.[31] The resume represented that he was an "interactive executive" at Comcast as well as a "senior executive,"[32] that he had a "leadership role" in the rollout of Comcast's Video on Demand service,[33] and that he was responsible for new business development for local and national cable advertising.[34] Scheu made the same set of representations in a bio submitted with the resume on December 5, 2005.[35] Scheu conceded on cross examination that there was no position at Comcast titled "interactive executive."[36] He also testified that he was a senior executive to the extent that he had significant experience, but that he had never held the title of "senior executive."[37] At his deposition, Scheu testified that his "leadership role" in the rollout of Video on Demand referred only to a "local leadership role [i]n conjunction with other people."[38]

---

They would have done a standard background check. Q. Okay. And so prior to Dean being extended a job offer, you were satisfied that Charter entered into a sufficient background check and pre-employment check with respect to Dean's past employment activities; correct? A. Yes. Q. No doubt about that; right? A. No").

[31]Scheu testified first that he was not asked for a resume until the middle of January 2006, "after [he] had already been offered a position." (*Id.* at 31:21–24.) He described the submission of a resume as "just a formality" unrelated to his hiring. (*Id.* at 32:1–3.) Because he had already been hired, Scheu believed that providing a resume was "either for file purposes or press release or something like that." (*Id.* at 32:6–9.) In fact, Hanson requested a copy of Scheu's resume via email on December 2, 2005. (Pl.'s Exh. 39; RT Day 1 at 122:19–25, 123:1–5.) On December 5, 2005, Scheu provided the resume to Hanson via email. (Pl.'s Exh. 39; RT Day 1 at 123:8–12.)

[32]Pl.'s Exh. 39; RT Day 1 at 124:5–13.

[33]Pl.'s Exh. 39; RT Day 1 at 124:14–16.

[34]Pl.'s Exh. 39; RT Day 1 at 124:17–20.

[35]Pl.'s Exh. 39; RT Day 1 at 124:21–23.

[36]RT Day 1 at 124:24–25, 125:1.

[37]*Id.* at 125:2–6.

[38]Scheu Depo. at 44:18–25, 45:1–4; RT Day 1 at 126:4–14 ("QUESTION: Anything else you see in that paragraph that appears to you to be an inaccurate description of your duties at Comcast?  ANSWER: I was considered a leadership role in VOD.  QUESTION: Just for the

Stated differently, he had a leadership role only to the extent that other people sought his opinion regarding the rollout of Video on Demand at the local level.[39] Finally, Scheu conceded that he was not responsible for new business development for cable advertising at the national level.[40]

8. Hanson testified that he reviewed Scheu's resume before hiring Scheu.[41] He stated that Scheu's representations that he was an interactive executive, that he managed the rollout of Video on Demand services, that he took an active role in developing ideas related to the rollout, and that he managed the startup of new media projects, qualified him to work in the capacity envisioned at Charter.[42]

9. At some point after receiving Scheu's resume, Hanson offered Scheu a job at Charter.[43] The offer of employment was contingent on the completion of certain formalities, which

---

record, VOD is Video on Demand? ANSWER: On demand, right. And when I say leadership role, I mean local leadership role. In conjunction with other people, too. It wasn"t just myself. I wasn't the overseer. I mean, I was – I was asked my opinion").

[39]RT Day 1 at 126:15–19 ("Q. So as you've defined leadership role, you mean that other people sought your opinion as to what they might do with launching Video on Demand; is that right? A. It was with other people, like I said in my testimony. And that was for local").

[40]*Id.* at 126:20–23 ("Q. You were not responsible at Comcast for any new business development for local and national cable advertising; correct? A. I was responsible for new business on a local level, yes, that's correct"). Scheu's deposition testimony called into question whether Scheu had any role in cable, as opposed to Internet, advertising. Scheu Depo. at 44:4–11; RT Day 1 at 127:19–25, 128:1 ("QUESTION: Anything else in that paragraph that appears to you to be an inaccurate description of your duties at Comcast? ANSWER: Well, some of this is not defined. QUESTION: What do you mean? ANSWER: Well, it says business development for local and national cable advertising. It should be probably Internet advertising").

[41]RT Day 1 at 201:11–12.

[42]RT Day 1 at 241:12–19.

[43]RT Day 1 at 32:24–25, 33:1.

included confirmation of his prior employment at Comcast.[44]  Following completion of these "formalities," Scheu was extended a formal job offer.[45]  At the time the offer was made, Hanson understood the designation of "senior executive" to mean that Scheu had strategic experience rolling products out, that he knew how to take an idea "from strategy to execution," and that he had supervised other employees.[46]

10.  Scheu's compensation package had multiple components, including a base salary of $125,000, an overall "executive bonus," an "override," and a "management business objective."[47]  Hanson was responsible for determining whether or not Scheu's performance

---

[44]*Id.* at 33:2–13 ("Q. And did he tell that you there were some formalities before you would be extended a formal job offer?  A. Yes.  Q. And what were those formalities?  A. You had to go through a background check.  You had to adhere to a drug test, and you also had to sign some other documents regarding company policy.  Q. Did Mr. Hanson inform you that Charter would also do an investigation as to your prior employment?  A. Well, he basically said that, yeah, they would have to confirm that – he knew I was working at Comcast, but they would just have to confirm it").  Scheu's resume included contact information for his supervisor at Comcast and for the officer who gave him Internet marketing responsibilities.  (*Id.* at 34:3–8.  See also *id.* at 9–11 ("So I thought those were the two most important contacts to provide Mr. Hanson because those were the people responsible for the skill sets that he was most interested in").  Scheu testified that Hanson knew both of these individuals.  (*Id.* at 34:14–18 ("I know for a fact he knew Mark Winkler.  How much he knew Marty I don't know.  But he did know Mark quite well, and they both knew each other, and I had worked with Mark at Tribune.  He was a national sales manager while I was national sales manager").

[45]*Id.* at 35:23–25.

[46]*Id.* at 242:11–21 ("Q. What did you understand, if anything, senior executive to connote?  A. I took it at face value that this was a person that would have strategic experience in rolling out products and would have the ability to take something from strategy to execution.  Q. Based on your interviews with Mr. Scheu and your review of his resume, did you have an impression one way or another whether Mr. Scheu had spent any time at Comcast supervising the work of other employees?  A. He certainly put forward that he was leading efforts of a number of people").

[47]*Id.* at 36:2–7.  The override was a bonus capped at $10,000 per quarter that could be based on sales performance or other subjective components.  (*Id.* at 36:8–20 ("THE COURT: What is an override?  THE WITNESS: The override was based on other subjective components that would come up.  So it was very subjective.  That's the best way I could explain it.  THE COURT: Is it a percentage add-on based upon an evaluation of subjective components?  THE WITNESS: Both the quarterly bonuses had a maximum total of $10,000 a quarter.  It was like

1    merited the override and management business objective bonuses.[48]

2    11.    Prior to the commencement of Scheu's employment, Scheu and Lorelai Kude, then a

3           manager at Charter, met "to discuss [his] position . . . and his expectations of what [Kude]

4           would be called upon to do to support [him] . . . in terms of the learning curve."[49]  Scheu

5           asked Kude to prepare an overview of the activities of the department designed to promote

6           the product as well as an overview of the functionality of the product.[50]  At the end of the

7           meeting, Kude was "disappointed" because Scheu "seemed kind of egotistical and self-

8           serving and basically uninterested in what [the department was] doing."  She concluded

9           that Scheu was "a poor choice, a poor hiring choice."[51]

10          **B.    Scheu's Early Days at Charter**

11   12.    Upon commencing his employment at Charter, Scheu received an employee handbook and

12

13   _____

14   6,000 and 4,000.  And initially it was based on a sales performance, but because I wasn't –
     because Navic wasn't up and running, there was – it was really hard to assess that in the
15   beginning.  So it was changed to other guidelines that we set forth").  The executive bonus was
     "based on how the company did as a whole."  (*Id.* at 37:2–5.)

16
17   [48]*Id.* at 205:8–15 ("Q. And you were the one who was responsible for determining whether
     or not Dean was going to meet his performance bonuses; correct?  A. In all except the corporate
18   bonus.  Q. Okay.  And the corporate bonus that you are referring to, if you take a look at Exhibit
     4, is that the executive bonus plan?  A. Yes"); *id.* at 206:3–7 ("Q. All right.  So that we fully
19   appreciate what you're saying, it was you and you alone who determined the amount of the bonus
     that Dean would receive with respect to the quarterly override?  A. Yes"); *id.* at 206:19–22 ("Q.
20   Okay.  And then with respect to the MBO bonus, you – once again, that was directly connected
     to your decision; right?  A. Yes").
21

22   [49]RT Day 2 at 114:23–25, 115:1–2.

23   [50]*Id.* at 115:3–8.  See *id.* at 115:19–25, 116:1–4 ("Well, the purpose of the meeting was
     supposedly for me to bring him up to speed on, like I said, on the product and what had happened
24   prior to his coming into the company with everything.  And I started to give him an overview and
     a presentation and kind of the back story, explained the product and its functionalities and a little
25   bit more in an in-depth way.  And partway through the presentation or the discussion that we had
     having, he became very kind of dismissive of the information that he was receiving and started
26   asking me questions that I thought were irrelevant to the subject matter at hand").
27
28          [51]*Id.* at 117:5–11.

                                                     10

signed an acknowledgment of receipt.[52]  Scheu read the code of conduct described in the handbook,[53] and took an online test regarding the handbook and the policies described in it.[54]

13.   Scheu commenced his employment at the end of January 2006.[55]  He understood that he was "to take a product that was in its infancy, that had no branding, so to say, and come up with strategies and tactics and a sales plan on how to market that particular product as well as come up with strategies for Video on Demand."[56]  Scheu also launched Charter's advanced media website, represented Charter at company events and speaking engagements, and trained executives on the Navic software.[57]  Because the Navic software was not fully deployed, however, Scheu's responsibilities initially focused on strategy.[58]  He described his position as a "work in progress" and "evolving" at the time he began his

---

[52]RT Day 1 at 42:5–17, Pl.'s Exh. 5.

[53]RT Day 1 at 43:1–9.

[54]*Id.* at 43:20–22.  Scheu testified that he was required to take the test because "there [had been] some major wrongdoing in the past, and they were trying to eliminate anything that was going on."  (*Id.* at 43:22–23.)  There is no evidence in the record of "major wrongdoing in the past" confirming Scheu's understanding.

[55]*Id.* at 38:11–12.

[56]*Id.* at 37:18–22.

[57]*Id.* at 38:2–10 ("I launched the Charter advanced media website and registered that name, Charter Advanced Media dot Com, and that took a lot of work, if you've ever done those type[s] of engagement[s].  So that was a major undertaking.  I was also representing Charter at a lot of different company events, speaking engagements.  There were numerous things that – I came up with a training program.  I trained all the executives.  Just a tremendous amount of work that I performed for the company while I was there"); *id.* at 50:14–20 ("Well, the marketing at Navic, we were trying to – first of all, we had to deploy the technology before we could go out there and sell it.  So that was a primary goal, was to expand the functionality throughout the whole region.  And after we were able to get the first flavor of Navic done, then there was another flavor of Navic which is called telescoping, which involved some Video on Demand").

[58]*Id.* at 38:15–25, 39:1–4.

1   employment.[59]

2   14.  Hanson testified that Scheu was to

3        "provide support in the rollout and expertise in Advanced Media

4        products. He would also conduct sales individually in support of

5        those products and shepherd the growing product list, specifically

6        Navic was the number one priority. . . . Dean was in a position to

7        represent that product better than anyone else, and I always felt that

8        the appropriate thing was for that person to be engaged in sales

9        themselves both on what we used to term four-legged call. So going

10       on a call with an account executive who might be selling it

11       themselves. But Dean was also responsible for selling to – talking

12       to agencies and national accounts about this product because . . . the

13       only place in the country where we had [Navic] available[ ] was in

14       his area of responsibility."[60]

15   Although Scheu was responsible only for the thirteen states that formed Hanson's region,

16   he sold predominantly to "national" accounts.[61]

17   15.  Craig Ruble testified that Scheu had several responsibilities:

18       "It was my understanding that Dean had, you know, a couple of

19       responsibilities. One primary one being, as it was described to me,

20       was that he would be instrumental in developing ideas, marketing

21       strategies, including maybe collateral material that might go with that

22       to help support the sales efforts with this new product. And so that

23       was one responsibility as I understood. Another responsibility was

24       really to simply drive revenue himself and make sales independent of

[59]*Id.* at 106:12–25, 107:1–6.

[60]*Id.* at 238:22–25, 239:1–19.

[61]*Id.* at 240:7–13.

what we did locally."[62]

Ruble stated that Scheu was responsible for creating marketing materials for Navic, creating and implementing a strategy to sell Navic as an add-on feature, and potentially attending sales calls and driving sales of the product.[63]

16.     Hanson testified that during Scheu's first few weeks, he "jumped in and laid out the things that were going to be done."[64]   Hanson also recalled that in a meeting where Scheu presented for the first time to a number of team members, Hanson "walked away less than impressed but felt that that might be a fact of being new, trying to understand what was going on."[65]   Hanson stated that Scheu "struggled to make a strong and clear presentation" regarding the Navic product and how it could be utilized by Charter.[66]

**C.     The Navic Technology**

17.     Navic is a technology that permits viewers to interact with a television commercial and addresses advertisers' concern that they never know if anyone is watching their commercial.  By enabling viewers to interact with the commercial, Charter could discover the number and demographic information of viewers who saw the advertisement and market that data to the advertiser.[67]   For instance, a viewer could press a button on her

---

[62]RT Day 3 at 133:12–21.

[63]*Id.* at 135:4–12.

[64]RT Day 1 at 243:15–16.

[65]*Id.* at 243:18–20.

[66]*Id.* at 243:24–25, 244:1–4.   Gail Scott, a human resources manager at Charter, also recalled Hanson's disappointment with Scheu's performance at this first meeting.  (RT Day 3 at 9:25, 10:1–4 ("We had an initial meeting.  I believe it was in Newport Beach, where Dean was introduced to the organization.  And I don't believe that Derek felt that that went off very well. And so we really didn't get off on the right foot in introducing Dean to the organization and his role").

[67]RT Day 1 at 45:1–8 ("Navic was a technology very similar in some ways to the business model that you see online.  It was for the first time what television advertisers always had a problem with, is is anybody watching our commercial.  There was no way really to tell that.  And

remote control to receive more information. Thus, the product had the benefit of quantifying "[f]or the first time . . . how many people were watching or at least had their cable box on."[68] It also allowed Charter to capture information regarding who clicked onto the commercial and mail an offer or coupon to them.[69]

18.     One aspect part of Navic is a functionality known as "telescoping," which allows an advertiser to couple a television commercial with an on-screen message that invites the

---

what Navic enabled users at home to do was actually to interact with the commercial. So for the first time they would get an interaction back, and they could market that data back to the advertiser").

[68]*Id.* at 52:5–13 ("Navic had the technology along with another company called TNS, which did the measurement. For the first time you could actually know how many people were watching or at least had their cable box on. You didn't know if they were watching, but they had their cable box on on a particular network or channel right down – right down – as a matter of fact, we had a meeting, and it was staggering how far off the numbers were from Neilson, how much lower they were. And it was pretty eye opening"); *id.* at 52:17–20 ("It was a big benefit because for the first time, they could say somebody is actually watching my commercial. In the past it was like is somebody watching it. Now they had proof that somebody was watching it"); *id.* at 208:11–25 ("A. Navic is a set top application that offers advertisers a degree of interactivity with the consumers as part of a 30-second spot. Q. And what did you understand that the advertisers would get? What benefit would an advertiser get from utilizing Navic? A. It created a level of interactivity with that 30-second spot, which is what they were purchasing that allowed them additional information and/or additional functionality as a part of that. Q. And to your understanding, was that interactivity a benefit to the advertiser? A. Depending on the advertiser, but the advertisers that used it obviously wanted it for a reason. Q. Well, one of the benefits of the interactivity was that Charter could actually report back to the advertiser how many people were interacting with the product; right? A. Yes. Q. And most advertisers liked that; right? A. Yes").

[69]*Id.* at 47:17–25. 48:1–4 ("Well, [obtaining information about viewers was] a privacy issue that we had to be careful about on how we structured or how we returned data back to viewers. That was a very sensitive area, but there were ways you could do it in which not to invade a viewer's privacy. And we went over that. But there [were] ways that Navic could be used, depending on the different types of technology, that you could never before give a television advertiser. So, for example, if you pressed A on your remote control and you wanted more information, we knew the address of that subscriber, and then we could fulfill that. We didn't let the advertiser fulfill it, but we would fulfill it, and that's how we kept the privacy issue. THE COURT: What do you mean fulfill? THE WITNESS: Fulfill means when you want to send out an offer or a coupon, it's called fulfillment").

viewer to click through to a longer infomercial.[70]

[70]*Id.* at 55:9–16 ("Basically what telescoping was is you can take on your remote control. You can hit A, B, C or select, and when that shows up on an overlay over your commercial, so you could say to learn more information about a particular program, let's say it was a product that you were trying to sell, you could then go into the Video on Demand portion of the cable system and see a half hour infotainment or infomercial on it and learn more about the product, and that was called telescoping"); *id.* at 56:4–21 ("The deal I did with Chase Manhattan was a $150,000 test, and what we did was we took Chase credit card names in the L.A. zones that we had rights to sell advertising in. We took those names. Then we overlaid it with our subscriber base. So we knew which names had credit cards and which names didn't have Chase credit cards. And then on top of that, we married it with axiom data. It's kind of like he can fax data to get an idea on household income. And there were like five data points that were very important to Chase. And this was all done by us. So Chase wouldn't have access to the names. And then after we overlaid all that data, we would know how to individually serve for the first time specialized ads to each individual household depending on – so in other words, if you're a Chase credit cardholder and they were giving away points, we would serve one ad, and if you weren't a Chase credit cardholder, there was an ad incentivizing you to become a Chase credit cardholder").

Mike Welsh described Navic in a more technical sense:

"Navic is a company that has an interactive application that resides on the set top box. There are actually two applications that Charter purchased. One is called the hypergate application. That allows for an overlay to pop up during a commercial, or as we say, a spot. And it allows for real time interactivity with a commercial. There are several different types of overlays. There's requests for information. There's voting and polling. There's essentially a quick tag.

So if I can give you an example of a quick tag, it's basically if you have – if you're a car dealer and you have, you know, one Toyota 4 Runner for sale and you want to just put a message up that doesn't have to change the creation of the spot, it allows for instant real time communication to the subscriber at home, which is the targeted advertiser for our client, which would be the advertiser.

\* \* \*

The other aspect is NBAND. NBAND allows for service functionality, like I channels. I-Channels or I-Weather, I-Horoscope or I-travel. It's basically data feeds, and when – and when you change the channel to that channel, it's really information that is provided via a data source that displays on the video for customers. It also handles microsite functionality and telescoping to Video on Demand assets.

\* \* \*

Microsite functionality is a video channel. It's a service that sits on the server in our head end. And I'll explain what head end is in a moment.

\* \* \*

Well, the head end is the central location to receive channels. So KTLA, you know, HBO, Showtime, Cinemax, it all comes into our head end via satellite. And

19.   Beginning in early 2005, Charter trained sales executives to discuss Navic with clients.

Lisa Lynn Behr testified she was trained to state that

> "this was a new product, an innovative product that was very exciting and would be something that possibly our current clients could use and to be honest with our clients and tell them that it was a new product, and we did not know the exact, you know, outcome. But the clients that I did offer this to as far as, you know, the opportunity to try it, I was always up [front] and honest with them."[71]

Behr said that she never gave her clients any warranties or guarantees regarding Navic's functionality during her presentations.[72]

---

then our head end actually has a bunch of equipment in the head end that sends the signal out via RF frequency, the co-ax cable in your home that's connected to the cable box. So that's how you get all the channels in the channel lineup, and it goes through the billing system.

\* \* \*

A microsite, it resides on a server in our head end that can serve up interactive functionality using NBAND. So you can set long format assets on there or voting and polling, or quizzes or something like that. It's a collection for an advertiser. So, you know, we don't have Internet access on cable. It's kind of our flavor to give a home page to an advertiser." (RT Day 2 at 29:9–25, 30:1–25, 31:1–7.)

[71]RT Day 2 at 190:15–22. Behr described Navic as "an opportunity that [advertisers] could use with their current advertising campaign. They had to have a substantial schedule on television to actually use this product to see if it would be beneficial to them or not. They – the people that I did offer it to was to my clients who had a substantial schedule where we could actually see if it did work or not. And basically it was at no charge. It was added value to enhance their schedule." (*Id.* at 191:8–15.)

[72]*Id.* at 194:2–4. See also *id.* at 194:7–11 ("A. This was, as I said before, something new as far as an interactive tool, and that if they would like to be a part of this, you know, test more or less or to see if this is something that would enhance their business, that we would offer this to them. There was never any promise of anything. They were very excited because they were on the ground level of finding out about it. Q. So you represented that you were still working out the functional issues? A. Right. And that was said several times to them, that we're going to work on this together. It was a partnership. I've had my clients for – at the time they were with

20.     When Scheu started at Charter in 2006, Navic was only deployed in certain "advertising zones"; Charter was in the process of rolling it out in other zones.[73] The telescoping feature of Navic had not launched in any market.[74] By April 2006, Navic was still in the rollout phase.[75] Scheu described the rollout as a complex and extended process.[76] He stated, in fact, that Navic was not fully rolled out by the time he ended his employment.[77] Later, however, he asserted that the rollout process was complete by the second or third

---

me for 10, 12 years. They trusted me, and I treated them very – with kid gloves because I knew I had to be totally honest with them from the get-go. If there were any issues of any sort, they knew about it"); *id.* at 198:14–17 ("Q. And when you pitched Navic to these advertisers, did you ever represent to them that its functionality worked 100 percent of the time? A. No"); *id.* at 204:6–12 ("Q. And did you ever tell them in those exact words, that this product doesn't always work? A. Not in those exact words. I said this is a new product, and we don't know all about the product, and there's a possibility that things may or may not work correctly, in our conversations. That was basically what I – how I presented it to my client").

[73]RT Day 1 at 38:16–17; *id.* at 207:21–25, 208:1–5 ("Q. So in 2006, you were rolling out Navic in the L.A. area; right? A. Yes. Q. And by rolling out, that means you were testing it; right? A. It was in different stages at different times in different places. Q. Okay. Was it completely functional in all of those different stages that you just referred to? A. Depends on how you define completely functional").

[74]*Id.* at 107:20–23 ("Q. And at that stage, Navic was in a beta test phase; right? A. We were working, and the telescoping for sure hadn't been launched yet, and the exact timing -- are you saying the time I started in January?").

[75]*Id.* at 47:3 ("Well, we were just rolling it out at this time in April"); *id.* at 53:24–25, 54:1 ("Q. To your knowledge were there still areas in Los Angeles where Charter was attempting to roll out Navic [in April 2006]? A. Yes").

[76]*Id.* at 54:11–15 ("Yes, we had a pretty comprehensive checklist on how to roll it out. And different objectives we had to hit as we were – components that we had to hit as we were rolling it out").

[77]*Id.* at 54:19–23 ("[N]o, it hadn't been completely rolled out, especially the telescoping. They were attempting right up to the time I left, there were still problems with getting Navic to work a hundred percent. It was my understanding it couldn't work a hundred percent").

1    quarter of 2006.[78]

2    21.    In approximately April 2006, Scheu authored a strategic plan for marketing Navic and

3           VOD.[79]  Scheu and Hanson went over the plan in detail together.[80]  Scheu testified that

4           Hanson "thought it was a very well thought out plan, and he was impressed on how much

5           detail there was to it."[81]  Hanson testified that it was a "reasonable and viable approach to

6           market[ing] Navic."[82]   Scheu described the plan as "a road map based on certain

7           assumptions of . . . revenue goals that [Charter] could hit marketing Navic, and the

8           strategy and tactics on how [it] could achieve" those numbers.[83]  He stated that the only

9           change to the plan Hanson requested was to change the term "value-added" to "value

10          earned."[84]

11   22.    Charter did not charge advertisers for Navic as a separate line item; rather, it used Navic

12          as an incentive to encourage existing advertisers to increase their advertising buy.  The

13          product was sold therefore, as a value-added or value-earned product.[85]  Charter perceived

15   [78]*Id.* at 61:13–16 ("It was in the second or third quarter of 2006, when we were getting
16   beyond the rollout of the product.  In other words, when we were done with the beta test and the
     friendly test, and we were still having problems").

17   [79]*Id.* at 39:15–24.  Scheu testified that he produced this report in April 2007.  Given that
18   he had been terminated by that date, the court concludes that Scheu misspoke and intended to say
19   April 2006.

20   [80]*Id.* at 40:22–25 ("Q. At the time that you submitted your marketing plan for Navic, did
     you have conversations with Mr. Hanson?  A. Yeah, we had – we went over the plan in detail
21   with each other"); *id.* at 213:2–3 ("Q. And did you go over that sales plan with him?  A. Yes").

22   [81]*Id.* at 41:2–3.

23   [82]*Id.* at 213:4–6.

24   [83]*Id.* at 44:20–23.

25   [84]*Id.* at 53:12–13.

27   [85]*Id.* at 40:2–6 ("It was sold as what Derek Hanson, my supervisor, wanted to call it as
28   value earned, not value added, which is a big distinction.  In other words, if you had the spending,
     if you spent a certain amount of money, then you earned the right to use the technology").  "Value

Navic as a tool to "combat the exodus of advertisers" from television to the Internet.[86]

earned means that you had to do a certain spend to earn the right to use Navic. You had to commit to a certain dollar amount, an increase in budget. You might be a new advertiser. There were a . . . number of flavors on how to qualify for value earned." (*Id.* at 45:20–24.) See also *id.* at 46:16–24 ("Well, I mean, it enabled – it enabled account executives to attract advertisers that were either thinking about leaving the medium, by offering them this new interactive tool. It was used as a way to attract new advertisers. There was an awful big flight of advertisers leaving to go to the Internet. So this was another way to say hey, we've got a tool that can give you reporting functionality like the Internet. So it was definitely a way to drive profitability in the future"); *id.* at 48:23–25, 49:1–6 ("We would market it, again, as a value-earned product, as I mentioned here, because I had value added in the original document that I gave to Mr. Hanson and who made me [change] it to value earned. And again, what value earned meant is that if you were spending a million dollars with the company this year and you agreed to spend a million two the following year on a yearly deal, that we would give you the ability to use Navic. In a sense you've earned the right to use that interactive activity"); *id.* at 52:23–25, 53:1–6 ("Again, it was how you phrase giving it away. We phrased it value earned. So did we in the beginning charge them for it? No, we didn't charge them for it, but they had to meet a minimum type of commitment based on their advertising schedule. And there were different requirements. Were they a new advertiser. Again, how much did they spend last year. Or maybe they were threatening to leave. Maybe they were going to direct mail or radio and as a last resort, we could say hey, we'll throw in Navic if you stay with us"); *id.* at 108:14–17 ("Q. Advertisers would buy spots, and if they made a certain buy commitment, they would have an opportunity to integrate Navic into that campaign as well; is that right? A. That was one flavor of it"); *id.* at 209:6–20 ("Q. Now, were you giving away Navic for free? A. Navic was a value add is how we termed it. Q. But your intent with Navic was to drive profit; correct? A. Yes. Q. You were seeking to convince advertisers to advertise through Charter based upon Navic's abilities; right? A. We were looking to increase share from those advertisers, and Navic was one of those components that could be used to help drive that share. Q. Now, in English, what you meant to just say was you were looking to get some more money from advertisers by convincing them to stay with Charter and advertise with Charter; right? A. Yes, in a competitive marketplace, we would be looking to use resources that we could to convince advertisers to spend more money with us").

Lorelai Kude testified that Charter "pre-identified appropriate candidates for this technology, and . . . offered it to certain customers based on an incremental increase in their already existing spending. So I'm not sure what you would like to call it. We called it value added at the time." (RT Day 2 at 90:4–8.) See also *id.* at 100;12–18 ("So what we were asking them to do was to invest a certain amount more than they were already spending to make an incremental increase in the prior year's spending so that they could participate in the interactive experience for the following year. And what they were receiving for that was more spots that ran just like all of their other spots in all the other zones plus the interactive campaigns").

[86]RT Day 1 at 49:16–21("Well, it was a tool to, again, combat the exodus of advertisers leaving local television and going to websites like Google and Yahoo and things of that nature

Ruble testified that Navic was marketed as a value-added product because it was

> "an emerging cool new bell and whistle that we had that we thought
> could be effective with advertisers in helping them reach their best
> potential customers and help them increase their sales. And so we
> thought hey, look, let's learn together. So for the most part, we kind
> of hand-picked those advertisers that we had a good relationship with
> that were willing to kind of test the product with us. And that's why,
> you know, we decided hey, instead of putting a price tag on this
> independently, it's going to be what we call value added, or some
> people refer to it as earned value, but with those advertisers that
> spend a lot of money with us and are good – are good advertisers
> with us, we basically offered it to them for free. But we also tried
> to increase the number of spots, we call them spots, the number of
> commercials that they buy on different cable networks as part of
> that."[87]

---

because of the reporting functionality and the data that you would be able to get back from the interaction. So that was one of the benefits of utilizing the Navic technology"); *id.* at 209:25, 210:1–5 ("Q. And the whole idea behind Navic was that it would give cable an opportunity to compete with some of the advertising dollars that were being lost to the Internet; right? A. Potentially"). Kude noted that "cable television advertising is a valuable product that works. And to be able to go into a new advertiser's office and get an appointment with a decision maker because we are telling them about a new and emerging technology was a very big advantage to the technology, just to be able to get into an advertiser's office, because they were curious about learning about the technology. Sometimes I would sit with an advertiser, and it was the first time I had met them, and I would use the Navic product to just get into the door to have a conversation with them. And then upon doing a business survey and really understanding what their business was all about, sometimes I would determine in the middle of a meeting that the technology wasn't right for them. Sometimes I would determine in the middle of a meeting that a simple spot advertising sale – a simple spot advertising schedule would do just fine for them, and sometimes I thought they were right for Navic." (RT Day 2 at 101:3–19.)

[87]RT Day 3 at 148:6–22.

**D.     Scheu's Employment in Late 2006 and Early 2007**

23.    Hanson testified that approximately six or seven months into Scheu's employment, he and Scheu

> "started to . . . have more discussions about areas that I didn't believe Dean was meeting my expectations or the expectations of the organization.   And most specifically, my concerns centered on a couple of things.   First, being his ability himself to secure appointments and actually close sales, also . . . his challenges in communicating and effectively driving the field organization. . . .
>
> I was also concerned that his understanding of the technology of which he was responsible for shepherding didn't seem to be progressing.   It wasn't up to what I would have expected someone with his experience to have had.   You know, that included the strategic plans that initially were built, lacking the execution of those."[88]

Hanson denied Scheu a portion of his management business objectives ("MBO") bonus for the second quarter of 2006 to reinforce the concerns expressed during their meetings.[89]

24.    Scheu testified that "he didn't know it if it was 100 percent [of the time that he met all his

---

[88]RT Day 1 at 245:1–15. Gail Scott confirmed that Hanson grew concerned about Scheu's performance. (RT Day 3 at 10:8–18 ("A. I know – I don't know if there were formal discussions, but I did sense that Derek was not feeling that Dean was making headway in terms of generating sales revenue or really coming up with a strategy for the area that he was hired for, the technology arena with the interactive media.   Q. What gave you that impression?   A. I don't think we were seeing any traction in that whole arena.   And I know that Derek, you know, we had one on ones, and there were discussions about various employees during those one-on-one meetings, and I know that there was some disappointment expressed about the lack of progress").

[89]RT Day 2 at 246:9–14 ("Q. What efforts, if any, did you take to impart upon Mr. Scheu that that was a concern of yours?   A. Through the – through him not making his MBO in the second quarter was one of those pieces, but in our one on ones we spoke frequently about the things that he needed to adjust and change in order to be effective").

performance bonus goals], but it certainly was a fair amount."[90] Scheu was granted a performance-based bonus for each quarter in 2006.[91] With respect to the portion of his bonus defined by meeting management business objectives, Scheu received a full bonus for the first quarter of 2006.[92] He testified that he received full override bonuses at all times prior to his termination.[93] In the third quarter of 2006, however, Scheu earned only 2/3 of the override for which he was eligible.[94]

25. Hanson testified that over the course of 2006, it became evident to him that Scheu had not been a part of a rollout of video-on-demand services at Comcast because his knowledge did not appear "commensurate" with the knowledge of someone with that experience.[95]

26. During late 2006, Hanson had a series of one-on-one meetings with Craig Ruble. Ruble told Hanson that he did not believe Scheu worked effectively with Ruble's field sales team, either in training the sales executives or attending sales calls.[96] Ruble testified that Scheu

---

[90]*Id.* at 41:7–8.

[91]*Id.* at 41:9–12. Scheu stated that no one ever "indicated to [him] that [his performance across any of [his] responsibilities was less than adequate to the company." (*Id.* at 41:17–22.) He also testified that he "received a lot of positive feedback from staff and managers. They were very impressed with the marketing materials, the website, a lot of the initiatives that the department was doing." (*Id.* at 42:1–3.)

[92]*Id.* at 129:17–20.

[93]Scheu Depo. at 125:6–14; RT Day 1 at 132:19–22 ("I know that whatever the requirements were, that as a rule, I met those requirements and that I was given right up to the day I left full – full compensation for my override").

[94]Exh. 37; RT Day 1 at 133:8–14.

[95]*Id.* at 247:2–5. See also *id.* at 9–11 ("Certainly the execution I saw and the strategy and execution that followed did not reflect that of somebody who had successfully launched products before").

[96]*Id.* at 250:6–11 ("He was – Mr. Scheu was directly responsible for working with Craig's sales team in the field, and Craig had expressed on multiple occasions that he didn't believe Dean was being effective in that, that in both the training and the sales calls that he was supposed to be attending with Craig's employees, that he was not being effective in that role").

never created "a viable or effective new marketing idea."[97] He also stated that his staff thought Scheu was arrogant and condescending.[98]

27. Ruble said that at one time Scheu proposed a video-on-demand content idea in which Playboy bunnies or otherwise scantily clad women would demonstrate how to make alcoholic mixed drinks.[99] Ruble told Scheu this would not be an appropriate product and that Charter was not in the adult entertainment business.[100] He also testified that Scheu pursued a sponsorship with a business called Sex Vodka, and in that connection, kept a

---

[97]RT Day 3 at 136:17–19.

[98]*Id.* at 141:1–4 ("Dean was oftentimes perceived as fairly arrogant, condescending, very -- titles were very important to him. And, you know, he just didn't treat people necessarily the way I like to treat people").

[99]*Id.* at 136:23–25, 137:1–19 ("Sure. I remember two really specifically and fairly vividly. Once, as Dean and I were discussing some strategies, one of the ideas that Dean wanted to bounce off of me and get my thoughts on was this notion or this idea of developing what we call content or video programming that would be on Video on Demand. And the idea was basically in a nutshell to get some Playboy bunnies, trying to paraphrase the way it came out. Get some Playboy bunnies and create a how-to video of mixing various drinks, Tom Collins or martinis, how to do that. And it was Dean's idea in the VOD environment that a viewer sitting at home could go onto the VOD channels and could choose to see how to mix a drink, and it would be the scantily clad Playboy bunnies, I guess, and Dean's real twist on it is we'd have the G-rated version and the X-rated version. The G-rated version would be bikinis or scantily clad, whatever Playboy bunnies wear, and the X-rated version would be obviously at least topless. I don't know that we got into a detailed description of what that would look like. But topless at least. And I remember him saying what college kid wouldn't love at a frat party or whatever to call up VOD on TV and see how to mix a martini").

[100]*Id.* at 137:20–25, 138:1–11 ("And I said – internally, I guess, I was dumbfounded, and I said, 'Dean, I don't really believe there's any applications for me. I can't find a sponsor for that. I'm not going to get a client to sponsor that.' I think his idea ultimately was that we'd get a sponsor that would say this is brought to you by ABC Company. And I said, 'Dean, it won't work. It's no good. It just won't work.' Q. And why didn't you think that an advertiser would sponsor that? A. Well, I would be uncomfortable presenting that to an advertiser, quite frankly. Advertisers, most businesses care about their reputation, and that is a – can be a very controversial area. We're not in the – I remember telling Dean we're not in the adult entertainment business. I don't want to be a programmer. We're in the sales business, and we need to be presenting ideas that are going to be beneficial for our advertisers, and this had disaster written all over it").

gallon bottle of Sex Vodka in his office and at one time took the bottle to a meeting.[101]

28. Ruble also testified to an incident that occurred at the Irwindale facility when Scheu came to meet with Ruble. Whether inadvertently or not, Scheu had parked in a spot reserved for customers rather than employees. An office employee placed a piece of paper on Scheu's windshield requesting that he not park there in the future. Scheu viewed this from a window and demanded that Ruble's administrative assistant go outside and remove the piece of paper. The incident and Scheu's treatment of Ruble's administrative assistant left her almost in a state of tears.[102]

---

[101] *Id.* at 138:16–25, 139:1–22 ("A. Well, the other idea – it was – I'm going to try to figure out – try to bring it to a point here on what was the sales idea. But I remember Dean, I think it was one of the potential advertisers that he was working on, I believe fairly independently. It was called the – the product was called Sex Vodka. And I vividly remember Dean, he'd come to Irwindale. I actually worked in a different location. I was based out of Irwindale. Dean came to visit me for a one on one, and I remember him carrying this huge bottle of Sex Vodka with him. And obviously, I thought that's a nice prop. I'll bite. Okay, what is that? So Dean explained that he felt as though – I think it was a new product, I don't know, I think they are called distillers, and it was a – some kind of potato vodka. I don't know much about alcohol. But I thought okay, I'll play along. He was working on some kind of sponsorship opportunity with them. And subsequent to that meeting, I remember – I remembered Dean, he would have that big bottle in his office in Long Beach, and it would sit behind his – there was a credenza behind his desk, you know, standard office equipment or furniture. And there was that big bottle. And it had to be this big. I don't know what you call that. A gallon of Sex Vodka. Q. Did any deal ever materialize with Sex Vodka? A. Not to my knowledge. Q. Do you recall whether Mr. Scheu would bring this bottle of Sex Vodka to meetings? A. I remember him bringing it one time to a meeting with me in Irwindale. But I can't recall other than when I had an opportunity to visit with him in his office, it was always sitting there, and it always struck me as a little odd").

[102] *Id.* at 142:17–25, 143:1–20 ("So Dean comes in, and the facilities manager, and I can't remember his full name, but his first name was Jim, very nice guy, he was tasked with kind of policing it and being sure that they keep that open. And he actually had these 8 1/2 by 11, very gaudy fluorescent kind of orange, I guess, kind of notice that said please, you know, this should be reserved for customers only, not for employees. Something to that effect. Please don't park here anymore. And I think it might even have said you may be towed or something like that in the future. It had two adhesive strips that you would stick on the window. And again, it was an 8 1/2 x eleven sheet of paper. And so I think Dean saw this through the window, and unbeknownst to me, he asked my assistant if she could go out and remove that. And I didn't know that it happened when it happened, but Donna, after our meeting, brought it to my attention, and [was] quite frankly almost in tears because she wanted to understand [whether] – she – was she

29. Hanson testified that prior to the annual sales conference in Las Vegas in February 2007, Shelly Blumquist reported that she felt Scheu did not treat her with respect.[103]

30. Lorelai Kude reported that she was "less than impressed by [Scheu]'s ability to train and [Scheu]'s conduct in the field and understanding specifically of the product, that he didn't understand the product."[104] Over the course of 2006, Kude concluded that Scheu "was

expected to do that, and I said absolutely not. It certainly wasn't within her job description. She didn't report to Dean. And it was something that stuck with me as, you know, a bad way to treat people. Q. In your opinion, how did that make your assistant feel? A. Well, certainly I guess – I don't know if I'd say demeaned, but confused as to is this something she would really have to do. Because I certainly have never asked her to do anything. As far as I know, no one else was brazen enough to ask the assistant to do something like that. In my opinion").

[103]RT Day 1 at 250:14–18 ("Shelly was concerned in the manner of things that Dean – that she was being asked to do by Dean and also the manner that she was being communicated to by Dean. Specifically being talked down to and really feeling, you know, I guess the word marginalized probably isn't strong enough").

[104]Id. at 250:21–24. Lorelai Kude was the Advanced Media and Community Development Manager for Hanson's department. (RT Day 2 at 20–23.) Her duties were to help sell Navic, train account executives and other managers as to its functionality, and supervise the beta testing of the product. (Id. at 89:8–13.) Kude

> "was actually the main person who would interact with the advertisers. The account executives, especially during the first year, which preceded Mr. [Scheu]'s appearance at Charter, their job was to basically bring me into an advertising agency or an advertiser's office and talk to them about the technology. So they were basically instructed to introduce me, and I was the one who pitched and sold most of the advertising that we did the first year. Because we were training the account executives to understand it and to properly present it during that time."
> (Id. at 90:20–25, 91:1–4.)

Before Scheu started to work at Charter, Kude would meet with advertisers and she
> "would tell them that we were acquiring a new interactive technology, and that we're very excited about it and that we wanted to offer them the opportunity to participate with us in the beta testing phase of this technology. And we told them that it had never been used before in California and that it had only been used by Time-Warner in Hawaii and in another market in the East Coast. It was the first time that anyone in California would be able to use this kind of technology. And we were basically looking for advertisers who had more of a pioneering spirit, if you know what I mean. People who were more risk takers and willing to step outside the comfort zone and boundaries of regular conventional advertising to be able to participate in this technology. And we told them that it was new and that

arrogant and condescending to the people that were working . . . in the office, especially to support staff and people who were not at the level that he was in terms of his position."[105] Kude also observed that Scheu did not comply with the company dress code. Kude said that Hanson "was pretty strict about suit and tie," but that Scheu "walk[ed] around the office without a jacket and with his shirt unbuttoned from the top and from the bottom in a very kind of beachy sort of way."[106] During the first three to four months Scheu was with the company, he and Kude attended sales calls with account executives. At these calls, Kude would present and Scheu would also speak.[107] Based on these experiences, Kude concluded that Scheu "did not have a grasp of the functionalities of the different modalities of the Navic product, as it existed, and he would say things to advertisers that were inaccurate about what the product could or could not do. And that was something that had to be corrected."[108] At some point, Kude began to complain to Craig Ruble on a "daily basis" that she "didn't understand what [Scheu] was doing at the company and why [Hanson] wasn't . . . firing him."[109]

---

we were testing it. And normally I would tell funny little stories about some of the amusing mishaps that would happen when we first started using the technology basically because I wanted to manage their expectations and let them know that this was a science project in progress and to understand that nothing about it was set in stone, nor did it function a hundred percent of the time exactly as we thought it was going to and that every single day we were learning new things about it, and invited them to be part of the experience." (*Id.* at 94:20–25, 95:1–18.)

[105]RT Day 2 at 117:21–24.

[106]*Id.* at 118:10–18.

[107]*Id.* at 119:7–20.

[108]*Id.* at 120:4–8. Kude specifically recalled Scheu telling an advertiser that a viewer could use the remote control to access the Internet by clicking during a commercial, "which [was] not anywhere even resembling – anything resembling the truth about the functionality of the product at that time." (*Id.* at 120:14–18.)

[109]*Id.* at 137:12–19. Ruble's recollection was with consistent with Kude's. See RT Day 3 at 144:3–24 ("Q. Did Ms. Kude ever complain to you about Mr. Scheu? A. Yes. Q. On how

26

31. Chuck Holdridge testified that "he was not confident that [Scheu] was going to, you know, bring value to his group."[110]

32. Paul Sly said that he "was not confident that what [Scheu] was bringing was providing value, that his communication style was not effective in working with his associates."[111]

33. Mike Szczechura reported that Scheu "was not being effective" and that he was not confident in Scheu's ability to bring the Navic technology and the video-on-demand technology to a proper sales objective.[112]

34. Mike Welsh stated that Scheu was unable "to understand the technical aspects of the product and that . . . he simply didn't understand what was going on with the product."[113] Welsh testified that he told Hanson he did not believe Scheu understood "the credit and how we work, how we do our billing."[114] He said that Scheu behaved with an air of entitlement while at Charter. He noted, as an example, that Scheu made extravagant requests for office supplies and furniture and treated Hanson's personal assistant, Shelly

---

many occasions? A. It was multiple. I don't know if I can put a number on it. But she often shared her thoughts and asked for advice and would explain her frustrations to me. Just multiple occasions. I don't know that I could put a number on it. Q. Do you recall the substance of her complaints? A. Yeah. They were fairly wide ranging. I mean, I think for the most part, they had to do with [the fact that] the ideas and the concepts that Dean was developing didn't make sense to her either. And sometimes even I remember some of the collateral material ideas, and it wasn't as if Dean had to actually do the artwork himself. I mean, it was just to come up with the concepts. She'd have to redo them or ask me if I thought those were going to be useful. And there's frustration there and then frustration with the demeanor and what she perceived as somewhat condescending, [she] was quite frankly usually confused, and I called it damage control. I'd always have to sit with Lorelai and do some damage control with her to try to hear her out and then do what I thought was appropriate").

[110]RT Day 1 at 251:6–8.

[111]*Id.* at 251:12–14.

[112]*Id.* at 251:18–25, 252:1.

[113]*Id.* at 252:9–12.

[114]RT Day 2 at 60:9–10.

Blumquist, as if she were his own secretary.[115]

35. In contrast to the views of these employees, Gail Scott, who worked at Charter as the human resources manager, developed a friendly relationship with Scheu.[116] Nonetheless, she was "taken a little aback" at Scheu's requests for furniture and his treatment of Blumquist.[117]

36. Based on feedback from his team, Hanson counseled Scheu about "the proper manner to communicate with folks in our division," particularly Blumquist, and how effectively to "communicate with the field associates," particularly Ruble, Szczechura, and Holdridge.[118]

37. As noted, Scheu did not receive a full MBO bonus for the second quarter of 2006. Hanson prepared an evaluation stating, with respect to an objective that required Scheu to assist in the development and acquisition of content for local markets and acquire a minimum of three distinct pieces of sponsorable content, that Scheu had developed a content tracker but

---

[115]RT Day 2 at 76:5–25, 77:1–3.

[116]RT Day 3 at 7:9–17 ("Q. And what was your relationship like with Mr. Scheu at Charter? A. We were peers, colleagues, buddies. It was a friendly relationship. Q. And when you say buddies, what do you mean? A. Mike and Dean and I, as peers and colleagues, would go to lunch together, and I'd say we kind of – we had camaraderie, and so we had – we all had a friendly relationship with one another"). Scott declined to testify that she had a similar relationship with Hanson. (*Id.* at 44:12–23 ("Now, what do you mean buddies? He was my boss. He was my boss. And I wouldn't characterize that relationship as buddies. Derek was, as all of us have been . . . treated, you know, sternly by Derek on more than one occasion, and I was no exception to that. He had very high expectations, and when those weren't met, you heard about it, and I was every bit a part of that. I did not have a personal friendship with Derek. I don't to this day").

[117]*Id.* at 8:21–25, 9:1–6 ("Um, my impression was he came in as an executive and saw himself as an executive and started ordering a lot of – I know Shelly, our assistant, was a little bit frustrated because there was a lot of requests for – you know, we were a bare bones operation, and there was the cherry wood this and this kind of desk and this kind of office and these kinds of supplies. So I think his expectations were that we treat him pretty executively on board. So I would say, you know, all of us were maybe taken a little bit aback by his expectations of what would be provided to him"); *id.* at 9:16–17 ("Derek's admin assistant felt like she had been treated as a personal secretary, personal assistant").

[118]RT Day 1 at 252:16–22.

28

had not secured any sponsorable content.[119] As respects an objective that required Scheu to develop market launch plans for Navic, Hanson stated that Scheu had "discussed, but not articulated" any market plans, and that he "did not follow[ ] thr[ough] on" web-based market initiatives.[120] As a consequence, Hanson awarded to Scheu 50% of his eligible MBO bonus for the quarter.[121] Scheu did receive his total override bonus for the quarter, however. Hanson testified that because the override bonus is based on sales figures, and because a sales target is difficult to set for a new product, he felt it would not be equitable or fair to deny Scheu an override bonus when his role was to build the business.[122]

38. Although, toward the end of 2006, Scheu became more involved in sales of Navic,[123] he had not made a single sale as of October 10, 2006.[124] As a consequence, he received only

---

[119]Id. at 253:21–25, 254:1–6 ("A. So Dean had managed to gain some – to complete the content tracker, which was a form basically that told us what content was available on the VOD server. The responsible content was the component that he was tasked with selling or with members of the team selling. Components of the VOD content. And that was not achieved. So he was not awarded that for that component. Q. Is it accurate that for that particular component you essentially gave him credit for the administrative aspect of it but not the sales aspect? A. Yes").

[120]Exh. 36. Initially, Scheu could not recall that the second quarter evaluation identified any MBO that was not fulfilled. After being shown the evaluation, he acknowledged that it was representative of the type of evaluation he received on a quarterly basis, and that it reflected MBOs for which he received only partial credit. (RT Day 1 at 129:21–23, 130:4–131:8.) See also id. at 254:14–19 ("The concern was that Navic was one element of Advanced Media. There were also these web components but also selling pieces to other things. He had not completed the plan. So we had discussed the plan, but he had not actually completed the plan. And the web initiatives themselves were not followed through on").

[121]Exh. 36; RT Day 1 at 131:15–19.

[122]RT Day 1 at 255:10–15 ("What you glean from that is that there were sales that were occurring by members of the team and that because that was difficult to measure, I had decided of my own volition to pay him the full amount because I felt it wouldn't be equitable or fair to, as we're trying to build the business, not pay him that amount as he was building that business").

[123]Id. at 58:24–25, 59:1.

[124]Id. at 133:15–18.

1  2/3 of his override bonus for the third quarter.[125]

2  39.  Scheu testified that throughout 2006, he reported to various co-workers that the Navic

3       technology was not working 100% of the time.  He stated, for example, that he exchanged

4       "constant e-mails" on this subject with Hanson.[126]  He also testified that he had "numerous

5       conversations" with Welsh and Hanson concerning Navic's non-functionality.[127]  Scheu

6       reported that Charter used employees or friends to check television advertisements to

7       ensure that the technology was working.[128]  He also testified that he received emails from

8       employees in the marketing department that certain functionality was not operating

9       correctly.[129]

10 _____

11 [125]*Id.* at 256:4–9 ("It would have been made on the fact that we did not meet the objectives
   that we did, that we had expected or laid out to each other.  And so that reflected the fact that
12 while some sales had been made by the field organization, all the sales that were expected, and
   specifically the sales that Dean – that I had expected of Dean, were not existent").
13

14 [126]RT Day 1 at 59:7–11 ("Yeah, we had constant e-mails that it wasn't working a hundred
   percent of the time, and that was just part of – as it was explained to me, of a new product being
15 rolled out into the market.  So it was not working a hundred percent of the time"); *id.* at 64:2–7
   ("Well, these were things that we brought up in our weekly meetings.  We had weekly meetings.
16 So we discussed these issues regularly. . . .  Mike Welsh and I and Derek Hanson.  When I had
   my one on ones with him, then again, these issues would be discussed").
17

18 [127]*Id.* at 59:20–25 ("Oh, yeah, we had numerous conversations.  It was our main topic of
   conversation usually, is it working, is it not working, how is this new zone that we're going into,
19 this new advertising zone, are we in a beta test, which means a test of a – do we have friendlies,
   which means do we have friendly people out there actually seeing how it's working").
20

21 [128]*Id.* at 60:5–7 ("It could be people that work for Charter or friends of Charter who are
   monitoring the system and seeing whether or not it's working.  We call them friendlies").
22

23 [129]*Id.* at 64:24–25, 65:1–12 ("Q.  And did you in fact receive E-mails from fellow
   individuals within the marketing arm of Charter that they watch various programs and the
24 telescoping or other functions of Navic simply failed?  A.  Yeah, on a number of occasions.  One
   occasion, I don't know if you're familiar with the Blue Man Group.  It's a – they do a touring
25 show.  And they were doing a show at Universal, and they had a half-hour show to promote that.
   So they were trying to utilize the Navic functionality.  And actually we took a schedule for this,
26 and they would show their commercial, and then when you, again, hit A to see kind of a teaser
   show of the Blue Man Group, you would be able to telescope to VOD to watch it, and we had
27 quite a number of problems with that schedule").  Hanson confirmed that Scheu raised concerns.
28

40.     Welsh testified that throughout 2006, he and Scheu had one-on-one meetings, either in person or via telephone, during which Welsh would update Scheu on the technical progress of Navic. These included discussions regarding reports that Navic was not fully functional for all users. Welsh told Scheu that the issues were being investigated and addressed, and that they hopefully would be corrected.[130] He reported that beginning in approximately April 2006 and continuing through the end of 2006, Charter received an email or a communication that something was wrong with the Navic system approximately one to three times per month.[131] Welsh said that he brought such issues to Scheu's attention during 2006, but that, in 2007, Scheu began to ask affirmatively about Navic's functionality.[132]

41.     Scheu testified that he came to believe that the set-top cable boxes used in some percentage

---

(*Id.* at 260:21–25, 261:1–2 ("He raised that – well, there were different stages. There would be stages where we were just getting ready to launch the product, and that function took a lot of work to get those technical pieces to come together. At other times there would be times when there would be a failure rate on the VOD server. So Navic would trigger, and it was supposed to send it to our VOD servers, and the VOD server wouldn't play").)

[130]RT Day 2 at 28:13–25, 29:1–4 ("A. Throughout 2006 we would have one on ones or get together, whether it would be in person or on the phone, and I would give him an update as to the project, yes. Q. And in giving Mr. Scheu an update about the project, the two of you would discuss that there were in fact reports that Navic wasn't functioning at a hundred percent; right? A. The – there were reports of people having issues; correct. Q. Okay. And in your discussions with Mr. Scheu, you would indicate to him that those issues were being investigated; correct? A. Correct. Q. And you would also indicate to Mr. Scheu that those issues were being responded to; right? A. Correct. Q. And hopefully corrected? A. Yes, correct").

[131]*Id.* at 38:21–25, 39:1–7 ("Q. And are you aware through your conversations with Mr. Hanson in April of 2006 that in fact he was aware that there were some issues with respect to Navic's functionality in 2006? April? A. Yes, during the project plan. Q. And it's correct that throughout the remainder of 2006, you and Mr. Hanson both received reports that Navic wasn't functioning at a hundred percent; correct? A. If you're saying we received an E-mail or a request saying something's wrong with this interaction on this – that I experienced on a box, I being the employee, then yes, we would receive one or two or three").

[132]*Id.* at 42:20–21 ("For most of 2006, I brought him issues. In 2007 he did say, you know, what's wrong with it?").

1      of homes could not function correctly with Navic, and therefore that Navic could not reach

2      100% functionality.[133]

3    42.    Hanson testified that he had conversations with both Scheu and Welsh regarding Navic's

4      level of performance.[134]

5    43.    Scheu said that, when he began to participate personally in sales calls after August 2006,

6      he "stayed away from whether or not the functionality of Navic worked a hundred percent

7      because we were thinking by the time the sales cycle caught up with the cycle of the

8      rollout, we were hoping that they would time with each other. But [that was never made

9      known to] the advertisers. . . ."[135] Scheu testified that, in 2007, pressure on Hanson to

10      generate revenue with Navic increased.[136] Scheu confirmed, however, that no one ever

---

[133]RT Day 1 at 61:16-20 ("Q. . . . [B]ased upon your conversations with Mr. Welsh, did Mr. Welsh indicate to you that there were some actual problems with Charter's system as opposed to Navic's system? A. Yes. Especially at the set top box level. We had old set top boxes which limit the functionality of Navic, which I remember one particular box in particular which was very hard to work with, which I believe was Scientific Atlanta boxes, SA-2000's they called them").

[134]*Id.* at 210:12-25, 211:1-11 ("Q. And, in fact, you would have conversations with Dean about the different levels of performance while you were rolling out Navic; right? A. Yes. Q. And, in fact, you'd have conversations with Mr. Welsh about the fact that while you were rolling out Navic, you'd have different levels of performance? A. Yes. Q. And during those conversations that you would have with Mr. Scheu about Navic's functionality, did you represent to him that you were -- you, as Charter, were working on resolving those issues? A. We were constantly in a state of working with Navic and Charter and advertisers to better understand the functionality of the product. Q. And as you moved through 2006 and the product was being rolled out, did you continue to discuss Navic's reliability or functionality with Navic's home team? A. Yes. Q. And did you continue to discuss Navic's abilities with Dean Scheu? A. Yes. Q. Did you continue throughout 2006 to discuss Navic's abilities with Mike Welsh? A. Yes").

[135]*Id.* at 63:11-16.

[136]*Id.* at 69:16-19 ("Q. Okay. And did Mr. Hanson indicate to you that it was important that you sell Navic in the later quarters of 2006? A. In 2006, and certainly more pressure came on him in 2007 to sell – to generate revenue for Navic").

directed him to make a misrepresentation to an advertiser.[137]

44. Also in late 2006, Charter created the new position of "General Manager Advanced Media for Los Angeles."[138] The holder of this position was to assume some of Scheu's responsibilities for the Los Angeles area, leaving Scheu's national responsibilities intact.[139] Hanson testified that the motivation for creation of the position was that advanced media products in Los Angeles were not "moving forward as well as we had expected."[140]

45. Hans Fischmann filled the position in early February 2007.[141] Fischmann's responsibilities were "the day-to-day execution of Navic from a sales, sales training, implementation, and roll-out perspective" with respect to the Los Angeles and Reno, Nevada areas.[142] Hanson testified that Fischmann "brought a level of sophistication, a level of detail and execution, and inspired confidence in the sales team that was truly impressive."[143] Fischmann testified that his "duty was to build a business around the Advanced Media business, which involved training account executives, going on sales calls, and essentially putting together processes and work flows so that we could grow a business around these products."[144] Elaborating further, Fischmann stated that he trained account executives to understand Navic and put together "work flow and processes for" Navic, including traffic and

---

[137]*Id.* at 114:9–14 ("Q. No one informed you, Mr. Scheu, no one directed you, I should say, excuse me, to misrepresent to advertisers the capabilities of Navic; correct? A. No one directed me? Q. To make a misrepresentation to an advertiser; correct? A. Correct").

[138]*Id.* at 138:16–20.

[139]*Id.* at 138:21–24.

[140]*Id.* at 263:3–9.

[141]*Id.* at 139:11–13.

[142]*Id.* at 264:6–8, 267:1–7.

[143]*Id.* at 264:18–20.

[144]RT Day 2 at 214:12–16.

billing.[145] This entailed ensuring that thirty to forty account executives understood the product so that they could sell it without assistance; it also required packaging and pricing the product.[146] Ruble stated that Fischmann was tasked to "do what [he] thought Dean was supposed to do" in driving sales.[147]

46. Gail Scott testified that after Fischmann was selected for the position, Scheu telephoned her and appeared worried that his job was in jeopardy.[148]

---

[145]*Id.* at 214:21–25, 215:1.

[146]*Id.* at 217:13–25, 218:1–13 ("So one of the very first tasks I had to do was get the account executives, 30 to 40 of them, up to speed, understanding the product so that they could sell it, you know, on their own without assistance. So extensive training, but prior to training, it required packaging. In other words, the Navic technology has very specific functions. There's voting and polling, there's display, there's telescoping, there's requests for information. Each one has a very different purpose, and so we had to educate the account executives to be able to handle that. They also needed to be priced out. So we developed a rate card so that everyone could understand that when I'd go talk to a client and I'd tell them well, if you're intent on doing this, this, and this, then it will cost you X. There was also work that needed to be done with traffic and billing in that there wasn't a way to enter an order directly. So since we established a rate card, we established other rules along those lines, also educating operations folks, because it's not just salespeople, but operations needs to be able to assist it. We put together quality control teams, monitoring processes. Communication and issue escalation, a number of things along these lines so that we could build a business that would scale across all of our, you know, across the entire company"). The rate card about which Fischmann spoke charged for Navic functionality on a per-interaction basis commencing in June 2007, and is not relevant to the time period at issue in this litigation. (*Id.* at 229:1).

[147]RT Day 3 at 146:19–23. See also *id.* at 147:1–10 ("A. Based on my understanding that I spoke to earlier, I really believe Dean was supposed to create ideas both independently and in concert with sales leadership, and take things from concept, or, you know, idea and concept to actually implementing and executing. And that also includes assisting in the sale, helping us to accurately present the product to advertisers. And the benefits and features that go along with it. Q. And you believe he failed to carry out those duties? A. Yes").

[148]RT Day 3 at 11:1–14, 20–25 ("It was 1/24. My sister had a doctor's appointment, and I had taken either the day or time off work on that date, and I remember this vividly, because my sister had a pretty severe medical situation that we were dealing with. And also my sister had heard my part of the conversation in the car. And it was once we had decided to go forward and hire Hans Fischmann. This phone call was, you know, Dean just asking me, you know, what I thought about Hans, that everybody seemed really excited about hiring him. What did I think

34

47.	Fischmann developed the impression that, as respects Navic, he "would often get better information from other people in the company" than Scheu.[149] Fischmann could not recall any instance in which Scheu raised a concern regarding Navic's functionality or misrepresentations made to advertisers with him.[150]

48.	Fischmann described the process for confirming and reporting any Navic functionality failure. He noted that for a telescoping feature to operate, multiple systems had to function in unison. Charter employees thus looked at reports for each system to ensure that each was operating correctly.[151] Fischmann reviewed reports on this functionality on a daily basis. Both Fischmann and the entire advanced media team were "trained on not only being able to pull the reports but to review them, what they meant, and how to . . . move forward."[152] Fischmann testified that there were "escalation paths" if functionality issues arose. When there was a functionality problem, both Navic and Charter generated "trouble tickets." Fischmann contacted Welsh at Charter and representatives at Navic.[153]

---

about it. What do you think is going to happen to me. Am I still going to have a job. Will I have a role at Charter. What do you think. You know, he was very, very worried and concerned about his continued role and employment at Charter. . . . I told him that I didn't know, and my M.O., when anybody comes and talks to me about a concern, is to refer them back – in fact, Mike knows this because I've done this with him. I refer them back to their manager. And I told Dean he really needs to talk to Derek about his role and clarifying his role versus Hans's role").

[149]RT Day 2 at 219:2–3.

[150]Id. at 220:18–24 ("Q. During these conversations, did Mr. Scheu ever represent to you that he was concerned that Navic was not functioning correctly? A. Not that I recall. Q. Did Mr. Scheu ever raise a concern with you that advertisers were being misled with Navic's functionality? A. No").

[151]Id. at 222:7–11 ("Q. When you say tied together, what do you mean? A. Meaning we would receive them and I could then compare one to the other. So it gets a bit technical. But a telescope requires multiple systems to work in unison. And so we could look at the reports and make sure that everything happened in sequence so that it actually did occur").

[152]Id. at 222:14–21.

[153]Id. at 222:25, 223:1–6.

Fischmann said that because of quality control processes, and because Charter employees were monitoring commercials in real time, he often became aware of a problem as it was happening.[154] He notified the advertiser if an issue arose with respect to Navic.[155] From February 2007 until the end of 2008, Fischmann recalled "[m]aybe a dozen" issues with the telescoping feature.[156] During that same period, a Navic banner appeared on viewers' television sets approximately 100 million times, and Charter received some 100,000 to 150,000 responses from consumers.[157]

49. Given the pressure to sell Navic, Scheu set up meetings with potential customers, including Neilson and Intel.[158] Scheu said that during these meetings, he did not tell potential customers Navic was not functioning at 100% because he did not "believe they would have bought the product."[159] Asked by his attorney whether he made any active misrepresentations, Scheu did not answer the question; instead, he said that "deep inside,

---

[154]*Id.* at 223:20–25, 224:1–9 ("Oftentimes as it happened. We had – we developed and put into place multiple quality control processes. So we had a number of people on my team whose job it was to actually monitor the commercials. We know when a commercial would air. It would be on the Discovery Network at 3:57 P.M. in this area, and we would actually publish schedules, and we had three or four people tasked on my team to actually monitor to see them happening. If for some reason it missed, we could also check it in the logs as well. Because this was also a new product, we often had a lot of eyeballs on it. So the account executive would often be watching. Sales management, and the client themselves would be watching. So there were many times where I'd be notified literally as the problem happened").

[155]*Id.* at 224:17–18.

[156]*Id.* at 225:1–4.

[157]*Id.* at 225:13–25.

[158]RT Day 1 at 70:4–8.

[159]*Id.* at 70:13–16. Hanson testified that he attended a meeting with Scheu at Intel's headquarters. Hanson said that he and Scheu "were always very clear in our presentations that this was a beta product, that this was a brand new cutting edge technology." (*Id.* at 256:25, 257:1–2.)

36

[he] was starting to feel . . . anxiety."[160]  Scheu later stated that he never informed an advertiser of "any concerns [he] had with Navic's performance," but "simply informed advertisers of the features and benefits of Navic."[161]

50.  Scheu prepared presentations for potential customers in which he referred to Navic as an "emerging model of advertising."[162]  Although Scheu attended sales calls with account executives, Scheu could not recall the name of a single executive whom he accompanied.[163]  Nor could he recall any misrepresentation that an account executive made to a potential customer.[164]

51.  Kude attended a dozen or more sales calls and other training sessions with Scheu.  She reported that "after almost every single one of these meetings, other managers and account executives would come up to [her] and say what the heck was that, after he would finish talking, because he would say things that were nonsensical, didn't make sense, were very much outside of the realm of what was really going on with the product, and he was

---

[160]*Id.* at 70:17–20.

[161]*Id.* at 116:20–25, 117:1–5.

[162]RT Day 1 at 109:3–25, 110:1–25, 111:1–25, 112:1–4 (describing presentations for Chase Manhattan, Spot Runner, David and Goliath, Nielsen Entertainment, and WOWOW, each of which contained the phrase "emerging model of advertising").  See also Pl.'s Exhs. 40–44.

[163]*Id.* at 112:10–16.

[164]*Id.* at 112:17–25, 113:1–23 ("Q. You also can't, cannot, identify a single misrepresentation to an advertiser made by any of them because you don't recall the actual substance of any of those meetings; correct?  A. I remember some of the – I mean, I remember going on the calls.  I don't remember who I went with on the calls.  Q. And you don't remember the substance of the meetings?  A. The substance of the meetings where we were presenting just like these Power Points here, trying to get people to advertise with the Charter Select.  Q. And you don't recall a single word uttered by any account executive at these meetings; correct?  A. I wouldn't say what the words were a hundred percent, no. . . .  Q. My question simply is you do not recall any account executive in your presence at a presentation before an advertiser making a misrepresentation about Navic; correct?  A. Not that I recall.  Q. And no one had informed you that he or she had been making misrepresentations about Navic's abilities to advertisers; correct?  A. No.  Q. No, that's not correct, or no one informed you?  A. No one informed me").

extremely disjointed sometimes."[165]  Kude said that she "was actually semi yelled at more than once by a couple of different managers asking me why I was wasting their time bringing them into the office and taking up their valuable time" given Scheu's poor presentations.[166]  Kude had to correct a number of Scheu's misrepresentations, noting that after Scheu's presentation, customers "were more confused than they were at the beginning of the presentation about the product, its functionalities, and what was going on."[167]

52.  In January 2007, Hanson attended a conference that Charter had arranged in Napa Valley to engage key customers and advertising agency representatives, and discuss Navic's potential for them.[168]  Scheu, Ruble, Kude, and Blumquist also attended.[169]  Hanson served as presenter at the conference, representing that Navic "was an exciting new product" and that Charter was "in the beta stage of th[e] product."[170]  Scheu made an introductory statement, which Kude described as "disjointed [and] weird."  She reported that Scheu "said things like, you know, we're standing on the edge of a brave new world, and it makes him almost want to cry to think about what's going to happen.  He said some things

---

[165]RT Day 2 at 129:8–14.

[166]*Id.* at 129:15–18.

[167]*Id.* at 130:2–4.

[168]RT Day 1 at 257:9–12 ("That was a conference that we had arranged as an opportunity to engage key customers and key agencies and to discuss Navic's potential for them and their clients and educate them as to this new product"); *id.* at 258:9–13 ("The purpose of the meeting was to share with them this new product, to educate them, to also gain their feedback on the product and how to make things better.  To discuss those opportunities and eventually hopefully to sell some spot advertising enabled with the Navic product as a part of that").  Kude reported that the purpose of the meeting was to "to sit and brainstorm about some of the usages of the product, and also it was intended to get a feedback from the advertisers about what they would like to see done with the product."  (RT Day 2 at 131:8–11.)

[169]RT Day 1 at 257:14–15.

[170]*Id.* at 260:3–11.

that were just really [wacky] even for him. And it was just embarrassing."[171] Dominick

Castle, an agency representative who attended the Napa Valley conference, echoed Kude's

views.[172]

53. Castle also recalled that Hanson represented at the Napa Valley conference that the Navic

technology was still in the beta stage.[173] He said that he did not hear anyone from Charter

represent something about the product that was untrue or inaccurate.[174] Castle also made

a presentation at the Napa Valley conference. By that time, he had been working with

Navic for approximately two years, and had observed that the product had significant bugs

that had to be worked out. Although it is not clear precisely what he said, Castle reported

that he made no misrepresentations.[175]

54. Behr also recalled that the functionality of Navic was discussed at the conference. He said

---

[171]RT Day 2 at 132:23–25, 133:1–2.

[172]*Id.* at 173:1–9 ("It was just – it was way out there. It was just – it was kind of strange and really didn't relate necessarily to – I remember recalling it didn't really relate to what we were there – originally the idea why we were there or how it related – the product related to us. In fact, like I say, afterwards we kind of were making jokes of kind of how strange that really was, and I thought to myself if this is what the meeting was, it's kind of a waste of time to come up").

[173]*Id.* at 174:12–18 ("I remember Derek saying that it was pretty much – this is what we have. And he kind of gave the analogy that it's like we're providing a pool and we're providing the water, and you guys splash in and tell us what it can do. We're kind of relying on you guys to develop it and tell us what components work, what are worthwhile and what are worthless"); *id.* at 175:2–8 ("Q. And Charter was candid to you and other potential advertisers regarding the state of Navic at that time; correct? A. Yeah, that's what this meeting was. Q. Were any representations ever made to you that this was a fail-safe product that worked a hundred percent of the time? A. Oh, never").

[174]*Id.* at 175:12–15 ("Q. Having worked with the product for two years up until then, during this presentation, were any representations made to you that you felt were not true or inaccurate? A. I can't recall any, no").

[175]*Id.* at 177:2–3 ("Yeah, I basically told them what I just told you, the issues that we were dealing with through the two years").

that at no time was it stated or implied that Navic worked 100% of the time.[176]

55.    At the end of the conference, Charter organized a dinner for client and agency representatives. Ruble paid the bill for the event and was reimbursed.[177]

56.    On February 19, 2007, Scheu had a meeting with Hanson in which he told Scheu that his 2007 compensation package would be identical to 2006 with no merit increase.[178] Hanson testified that Scheu was not "due any sort of merit increase because [his] performance had not supported that."[179]

57.    On February 21 and 22, 2007, Scheu attended Charter's annual sales conference in Las Vegas, Nevada.[180] After the conference, Scheu had no further one-on-one meetings with Hanson.[181] Hanson also no longer said hello to Scheu in the hallway or made eye contact with him.[182]

58.    On the last day of this conference, February 22, 2007, Hanson held a meeting in Las

---

[176]*Id.* at 200:14–25, 201:1–6 ("Q. During the presentations at Napa, at any point was it presented to the advertisers that Navic worked a hundred percent of the time? A. No. Q. Was it ever implied that it worked a hundred percent of the time? A. No. Q. What did they say about its functionality? A. That it was a new product and that it had these capabilities and the potential of being able to help them in their marketing, but that we didn't know because we had not really tried it on any substantial schedules, and if any, you know, anyone would like to include this with their advertising, that this was available to them, and basically at no charge. Q. And were these the same types of representations that you would make when you pitched a client on Navic? A. Yes").

[177]RT Day 1 at 259:4–17.

[178]*Id.* at 139:17–21. There is some dispute as to whether Scheu was "upset" about the lack of a merit increase. Scheu testified he was "totally happy with it." (*Id.* at 139:23–25.) On February 20, 2007, Scheu sent an email to Gail Scott confirming the package. The email offers no indication that Scheu was upset. (Exh. 19.)

[179]RT Day 1 at 267:17–21.

[180]RT Day 1 at 142:3–7, 12–13.

[181]*Id.* at 142:12–13.

[182]*Id.* at 143:5–6.

Vegas with "several of [his] associates" to evaluate Scheu's performance, and determined that "he was no longer of value to the company."[183]  The associates included Szczechura, Holdridge, and Ruble.[184]  As a result of this meeting, Hanson decided to eliminate Scheu's position.  He stated that immediately after returning from Las Vegas, he spoke via telephone with Jim Heneghan[185] regarding his intention to terminate Scheu's position.[186]  Hanson testified that thereafter, he told Gail Scott he would be terminating Scheu's position.[187]  Hanson delayed telling Scheu because a severance package had to be

---

[183]*Id.* at 222:11–16.  The meeting took place in one of the boardrooms at Caesar's Palace. (*Id.* at 222:25, 223:1–2.)  The Las Vegas meeting gave Hanson an opportunity to meet with these three employees together, as Szczechura was based in St. Louis, Missouri, and Holdridge in San Luis Obispo, California.  (RT Day 2 at 22:23–25, 23:1–5.)  Welsh testified that while he could not recall this meeting, it was a common practice for Hanson to hold break-out meetings with members of his leadership teams.  (*Id.* at 36:24–25, 37:1.)  Ruble had a specific recollection of the meeting.  (RT Day 3 at 154:15–22 ("It was – it was basically that Derek was sharing with us that – well, first he was asking, you know, if we felt as though Dean brought value, and to my knowledge that was the first time we were all together at the same time in person, and we each – we kind of went around the table and wanted to, you know, get a degree of comfort about how we felt about Mr. Scheu and the value he brought to us and the company. So we told him how we felt, and then that was when I believe Dean – excuse me, Derek shared with us that he thought it was ultimately he was going to have to make a change").)

[184]RT Day 1 at 269:19–21.  All three reported that given the lack of added value, "they would not suffer at all if Dean's wasn't in place, and that having local resource or no resource would be the same."  (*Id.* at 270:13–15.)

[185]Jim Heneghan was a senior vice president at Charter and the employee to whom Hanson reported.  (*Id.* at 236:10–17.)  Hanson discussed the issue with Heneghan because "a reorganization of [his] business unit [is] . . . a pretty germane subject for" discussion with Heneghan.  (RT Day 2 at 18:10–11.)  See also RT Day 3 at 12:5–7 ("Derek had let me know that he was going to restructure, make some restructuring decisions and realignment decisions within the division. And so Dean's position was one of those").

[186]RT Day 1 at 228:10–15.

[187]*Id.* at 225:6–14.  See also RT Day 3 at 76:9–11 ("Q. Okay.  And so when did Mr. Hanson tell you that he was going to eliminate Mr. Scheu's position? A. The best that I can recall is the end of February").

developed, a matter that was outside his control.[188]

### E. Scheu's Stated Concerns about the Functionality of Navic

59. Scheu testified that "towards the end of 2006 [or] the beginning of 2007," he asked Welsh whether Navic had a functionality that was capable of "credit[ing] back the advertiser." Welsh allegedly responded that it did not.[189]

60. Scheu stated that during the first quarter of 2007, he "started to become more vocal," telling Welsh that Hanson was urging him to keep selling and representing Navic as functional.[190] Scheu said that following sales calls with clients such as Intel, he expressed concerns to Welsh, and "start[ed] to feel [an] ethical responsibility to the customers."[191] He testified that he reported this "ethical feeling" to Welsh, but did not share the feeling with Hanson "as strongly" because, in his words, by the time he started to have ethical concerns, he and Hanson "weren't communicating as much."[192]

61. Scheu testified that during 2007 he had further discussions regarding Navic's functionality with unspecified "sales managers" and with Craig Ruble.[193]

---

[188]RT Day 2 at 229:1–4.

[189]RT Day 1 at 81:24–25, 82:1–6 ("I discovered the fact after – towards the end of 2006, the beginning of 2007, that when the functionality of the product wasn't working a hundred percent, and I was marketing it out there, that unlike traditional 30-second advertising, that you are able – when there's a technical error, credit back the advertiser. When I had asked Mike Welsh do we have that functionality for Navic, he said no. So it was at that point that I became very concerned").

[190]Id. at 72:1–11. Scheu stated that during this early 2007 period, he had shifted more focus to national rather than local sales. (Id. at 72:16–25, 73:1–3.)

[191]Id. at 74:4–6.

[192]Id. at 74:10–11.

[193]Id. at 74:25, 75:1–5 ("Yes, we had discussions with sales managers. I know when I would talk to Craig Ruble, I would have one-on-one conversations with him. He would even bring up sometimes whether it was Navic or was Video on Demand, whether it was functioning correctly. When it was Video on Demand, we had a number of issues with that in the beginning, too").

62.     In early 2007, Welsh noted Navic's 20-30% contention rate for the first time.  The parties dispute the significance of this figure.  Scheu and his attorney appear to believe that the contention rate is the product's failure rate, although Scheu never testified to this definition.[194]  While Scheu did not state his understanding of the significance of the 20–30% figure, he did testify that he reported concerns about that figure to Welsh and to Tom Walsh.[195]  He also said that in one-on-one meetings with Hanson, he said that "this [was] what we[ were] seeing or experiencing right now in certain advertising zones with the rollout of Navic."[196]  Welsh, for his part, testified that he never discussed an error rate of 20–30% with Scheu.[197]  In fact, Welsh testified that the error rate would have been significantly lower, something less than 0.1%.[198]

63.     There also appeared to be confusion regarding the relative meaning of "contention rate"

---

[194]*Id.* at 75:19–25, 76:1 ("Q. And did Mr. Welsh at some point in time represent to you that the contention rate or the failure rate of Navic was between 20 and 30 percent of the time? A. That's – that's the figure that he gave me that he got back from the cable side, and when I say the cable side, we're the advertising side.  The cable side is the system side, and from feedback from Navic, who is responsible . . . for licensing us the product").  Scheu had previously, in discussing a promotion by the Blue Man Group, testified that "we had quite a number of problems with that schedule"; he did not elaborate on the nature of the problems.  Scheu noted that the failure had been discussed in emails he received and stated: "[W]e called it contention issues." Scheu did not describe what the "it" was.  (*Id.* at 65:3–14.)  Later, Scheu's attorney asked him whether he believed that "the bugs or the contention issues" would be worked out.  Scheu said yes. (*Id.* at 66:7–11.)  At no point during Scheu's case-in-chief did he or his attorney offer a definition of the term "contention."

[195]*Id.* at 76:12:17.

[196]*Id.* at 77:2–8.

[197]RT Day 2 at 44:23–25 ("Q. Okay.  It's your testimony that you never discussed with Mr. Scheu the error rates of Navic in 2007?  A. At 20 to 30 percent?  No").

[198]*Id.* at 45:1–7 ("Q. Well, is it your recollection that you discussed error rates at a lesser percentage?  A. Well, if you sent me one E-mail that said you had a problem, then one E-mail times how many subscribers we had, how many spots that went out, it would be, you know, very, very, very, very small percentage.  .0000 something.  We have over – at the time we had about 300,000 subscribers").

and "error rate." Welsh provided the clearest testimony. He stated that a contention rate is the percentage of people in a given market who could attempt to access a particular asset – in other words, simultaneously press a button to access a video – without errors occurring. The higher the contention rate, therefore, the fewer the errors.[199] When an error occurs, the user receives a message stating that he or she should try again.[200] Welsh did not define "error rate," but the court infers that the error rate would be calculated by dividing the number of people receiving an error message by the number of people attempting to access the asset.

64. Fischmann also testified to the definition of the "contention rate." He agreed with Welsh that the contention rate is the percentage of people in a given market who can attempt to access a particular asset.[201]

---

[199]*Id.* at 46:5–17 ("A contention rate is strictly our video plant or VOD plant. It is a – it is a number, a percentage that basically – which was between 4 and 6 percent per VOD market. So for instance, our Long Beach market had about 80,000 subscribers. So between 4 and 6 percent of 80,000 would be able to call up a VOD asset at that given moment. So 4 times 8 is 32. So 3,200 people. If 3,200 people pushed the button to see something at 8:00 P.M. to watch on HBO, then they would get an error rate. They would get an error on VOD, and then the system would refresh, and they could push the button again, and then the asset would play back. So only so many people could access a given asset at a given moment").

[200]*Id.* at 49:16–25, 50:1–8 ("Q. Okay. And so it's your belief that with Charter's system, if a customer were to attempt – or if too many customers were to attempt to interact at any one given time, they would – some portion or some percentage of them would receive an error message; right? A. Yes. Obviously, if you push the button and you didn't get through, you would get the VOD error message. Q. And did the VOD error message indicate that due to Charter's bandwidth restriction, you'd have to press the button again if you want to further connect? A. Not that way. It gives a server error. Q. And does it give a server error saying please try again? A. Yes. Q. And what was the description as to how many times an individual should attempt to make that connection before the server told them too bad, too sad? A. It's just – it's on the screen. So the customer has to read it and exit out and try again").

[201]RT Day 2 at 231:8–21 ("The contention rate, when you engineer a system, you design it to be used by X number of consumers at a time. It's not engineered to support 100 percent of everyone simultaneously pressing buttons. The contention rate is the level of engineering safety, if you will, that we make the assumption that X amount of people will simultaneously take an action. So in particular, the contention rate . . . for various products may actually be at various

44

65.  On February 25, 2007, Kude sent an email to Fischmann, Welsh, Ruble, Walsh, and Scheu, among others.[202] She described a failure of the telescoping feature, i.e., the fact video would not load after she selected that option. Kude's conclusion was that telescoping was not working in Long Beach, California.[203] Scheu described this as an example of the type of emails he was receiving in early 2007.[204]

66.  Scheu testified that during 2007, there were ongoing conversations regarding the "failure rate" of Navic among employees working on the project. He stated that he conveyed his concerns to Hanson, who was not responsive to them.[205] Scheu said that he developed an "uneasy feeling" that Hanson was not being as responsive as he should be.[206] Scheu

---

levels. The contention rate for telephone service would be at a different rate than the Video on Demand service, which would be different from the Navic service based on usage, patterns of the subscribers. During my tenure with Charter, I never actually hit a point where we pushed the bar on the contention rate"); *id.* at 232:7–11 ("Think of it like you would a bridge. A bridge is engineered to support so much weight. So we're basically engineering it to carry so much load. And if we exceed that load, then the contention rate is an issue. If you were not exceeding that load, then it's not an issue").

[202]Pl.'s Exh. 11.

[203]*Id.*

[204]RT Day 1 at 77:25, 78:1–3. Scheu did not provide other "examples." Kude, who was the author of the email, emphasized that it concerned Long Beach, "which was one of the final zones [in which] telescoping was rolled out. . . ." (RT Day 2 at 17–18.)

[205]RT Day 1 at 78:15–18 ("Q. In the group that you were working with who was attempting to roll out Navic, did you have ongoing discussions about the failure rate of Navic? A. Yes, we did"); *id.* at 79:3–14 ("Q. Did Mr. Hanson ever respond to your concerns about the failure rate of Navic? A. No, he did not. Q. Did you have – did you in fact have conversations with Mr. Hanson about your concerns regarding the failure rate of Navic? A. Yes. Quite a number of conversations. Q. At some point in time, did you grow concerned that Mr. Hanson wasn't being responsive to your concerns regarding the failure rate of Navic? A. I was feeling – yes, I was feeling uneasy that he was [not] being as responsive as he should be").

[206]*Id.* at 79:15–22 ("Q. Well, when you say you were feeling uneasy, that he wasn't being as responsive as he should be, what do you mean by that? A. Well, when you're out there trying to get an advertiser to advertise with you using a new technology, and you're leading advertisers to believe that the technology is working when it's not working a hundred percent of the time, it's

reported that he shared this uneasy feeling with his co-workers "all the time."[207]

67.   Scheu testified that during February 2007, he attempted to follow up with both Welsh and Hanson regarding the inability of Navic to credit back advertisers when the technology failed.  He stated that Hanson was not responsive and that Welsh told Scheu to discuss it with Hanson as a "sales issue."[208]  Hanson testified that he told Scheu "the value of the advertising that was being bought was . . . the spots themselves, and if the spots didn't run, we always provided refunds for that."[209]  Welsh stated that he told Scheu that advertisers were charged for the thirty-second spot and not for Navic functionality and that if he had problems with that, he should raise the issue with Hanson.[210]

---

an uneasy feeling").

[207]*Id.* at 79:23–25.

[208]*Id.* at 82:7–22.

[209]*Id.* at 261:18–21.

[210]RT Day 2 at 54:3-10 ("What you're referring to is basically, I would say something that Dean mischaracterized and just a general understanding of what we do.  The way he presented the not being able to credit back a customer is similar to what you're saying.  A client, a customer pays for spot advertising.  So if the spot runs, they pay for the spot, and if he had an issue, I said you need to take that up with Derek").  See also *id.* at 58:12–25, 59:1–3 ("As a value add, if the 30-second spot runs, that's what the client is paying for.  Your client is shaking his head no, but let me say it this way.  Our client gets a bill for the commercial, okay?  When a contract comes in and says I want a thousand spots in Long Beach, and we run a thousand spots, we have a verification system on our ad inserter that says when those spots ran and on what networks.  That's the verification that comes back through our billing system that says okay, you asked for a thousand spots, we fulfilled a thousand spots.  The spots are at this rate.  So that bill goes to the customer.  In addition, if those – if any of those folks utilized Navic functionality, they would also get another report that says here is the report that says here's all the impressions, which is how many times an overlay went to a home, and then here's how many interactions"); *id.* at 64:3–8 ("And that's where I used my finger and said you need to go talk to Derek if you believe you need to give a credit.  That's a sales issue.  You guys can give a credit.  It's your client.  It's your relationship, and you need to do – they need to do what's in the best interests of maintaining the customer").  Welsh analogized not reporting whether the telescoping feature launched to not reporting whether a user's television is on or whether the user is home when a particular spot runs.  See *id.* at 65:14–18 ("Once again, it's – we don't – we invoice based on what spot is delivered and verified.  We don't know if the customer is home.  We don't know if they have their

46

68. Scheu stated that he had another discussion with Hanson, but was not "successful."[211] Scheu said that, thereafter, he discussed the problem with Gail Scott. Specifically, he reported he "told her that we were engaged in what [he] felt was illegal advertising practices."[212] Scott advised Scheu to discuss the issue with Hanson.[213] By that time, however, Scheu and Hanson were no longer having one-on-one meetings.[214]

69. On or about February 24, 2007, Scheu sent a letter to Charter's chief compliance officer, Grier Raclin.[215] In the letter, Scheu stated that certain events that had transpired over the preceding 45 days compelled him to write. The letter addressed two topics. The first was Hanson's purported failure to represent the functionality of Navic accurately to Charter's chief operations officer. Scheu stated:

> "Derek and I had a conversation during my 1 on 1 meeting last week

---

TV on. We don't know if they are watching. We don't know if it's on mute. We don't know these things. We do know that we have a mechanism of delivering spot to the home, and that's what our customers pay for").

[211]RT Day 1 at 82:7–22.

[212]*Id.* at 83:1–2.

[213]*Id.* at 83:8–9.

[214]*Id.* at 83:11–13.

[215]Pl.'s Exh. 20; RT Day 1 at 86:3–9. Scheu testified that he wrote the letter because "what was drilled into us when we found that there was some sort of impropriety or something we felt was unethical in the company, that we were supposed to contact the chief compliance officer, and that's what I did"). There is some dispute regarding the date on which this letter was sent in light of a notation that an attached email was dated "2/25/07." (Pl.'s Exh. 20; RT Day 1 at 145:25, 146:1–4 ("Q. And if I direct your attention to the bottom of the first page, the last two lines, it says: 'As of this date, Navic is still not fully operational. See attached E-mail dated 2/25/07, titled dismal telescoping experience of Long Beach.' A. I think that was a typo. Q. Does that refresh your recollection that the letter was not sent until at least February 25, 2007? A. It could have been on the 25th instead of the 24th. I might have written it on the 24th and then received this – this E-mail. So then I attached it").) After further questioning, Scheu conceded that he thought "it was sent out on the 25th" of February. (*Id.* at 174:1.)

47

on the morning of Tuesday February 20th.[216]  One of the topics we discussed was technology we have licensed from a company called Navic.  Derek informed me during our meeting that he received a call from Mike Lovett the COO regarding the status of Navic sales in Los Angeles.  Derek also informed me that it was communicated to Mike Lovett that Navic was successfully working and fully deployed throughout the Los Angeles area at the time Mike signed the [s]even-figure Navic licensing agreement.  Derek's main concern[ ] was the fact that the Navic technology was not [ ] fully deployed and operational at the time Mike signed the license agreement, which Derek knew about.  Meaning the COO was not fully informed of the true status of the Navic technology before signing the Navic contract.  I mentioned to Derek we are really only in the B[e]ta state of the rollout [and] . . . received no response.  As of this date, Navic is still not fully operational."[217]

The second complaint concerned the fact that at a conference with potential customers, Hanson had asked a subordinate to pick up the bill for a dinner when company policy required the most senior executive to pay a dinner bill.[218]  Scheu testified that he "had [a]

---

[216]Other evidence indicates that the meeting actually took place on February 19, 2007.

[217]Pl.'s Exh. 20.

[218]*Id.*  See also RT Day 1 at 146:14–25, 147:1–6 ("Q. You also did not express any concern at all about the alleged inability to credit back advertisers for technical difficulties with Navic; correct?  A. That wasn't brought up in this E-mail, no, I mean in this document, no.  Q. Rather, the two things you focused on in this letter were Mr. Hanson's alleged misrepresentations to Charter's COO about Navic's abilities.  That was one thing you conveyed in this letter; correct?  A. Correct.  Q. And the second area of focus in this letter was the allegation that Mr. Hanson had a subordinate pay the bill instead of him paying it at the Napa Valley conference for the advertisers?  A. Right.  Q. Those were focal points of this particular letter; correct?  A. Right.  In this particular communication, you're correct.  Q. And therefore, in this particular communication, there was no allegation brought to Mr. Raclin's attention, assuming he even got

concern" about crediting back advertisers as he was writing this letter, "but the letter was going on and on." Apparently, he did not include that complaint in the letter because he was concerned about its length.[219] He said he knew "firsthand" that the two issues discussed were "against corporate policy," and that crediting back advertisers "[was] a concern, but" payment of the dinner bill and Hanson's purported misrepresentation to Leavitt regarding the functionality of Navic at the time the Navic license agreement was signed were "top in mind for [him] when [he] wrote this letter."[220] Hanson testified that he did not see Scheu's February 24, 2007 letter and was not informed of its existence prior to Scheu's termination.[221]

70.  Grier Raclin, Charter's chief compliance officer, recalled seeing the letter a couple days after it arrived. It caught his attention because he and a deputy compliance officer, Christin McMeley, had been looking into company entertainment practices.[222] Raclin referred the matter to McMeley.[223] He said he never discussed the allegations in Scheu's letter with Hanson and did not direct anyone to speak with Hanson.[224]

71.  Scheu initially testified that during his February 19, 2007 one-on-one meeting with Hanson, he "mentioned" a 20–30% failure rate.[225] He later contradicted this statement,

---

this, that you were – that there was a concern with misrepresentations being made to advertisers; correct? A. Not in this particular document. Q. And also no communication to Mr. Raclin in this letter about the inability to credit back advertisers; correct? A. Not in this letter, no").

[219]*Id.* at 147:24–25, 148:1–2.

[220]*Id.* at 148:23–25, 149:1.

[221]*Id.* at 279:1–4.

[222]RT Day 4 at 13:3–15.

[223]*Id.* at 13:16–23.

[224]*Id.* at 13:24–25, 14:1–3.

[225]RT Day 1 at 87:4–10 ("Q. During that meeting, did you discuss with Mr. Hanson your concerns regarding the representations that Navic was functional when it fact it had a 20 to 30

however, when he testified that March 21, 2007 was "around the time frame" when he first learned of the 20-30% figure.[226] The assertion that Scheu discussed a 20-30% failure rate with Hanson on February 19 is also contradicted by Scheu's March 28, 2007 letter to a deputy compliance officer, in which he stated that he only learned of the "20%+" contention rate on March 21, 2007.[227] Scheu testified on cross examination that prior to March 21, 2007, he "didn't have a concrete number in mind,"[228] and ultimately admitted that he "didn't know" the percentage contention rate at the time of the February 19, 2007 meeting.[229] The court therefore concludes that, if Scheu reported the figure at all, he could not have done so prior to March 21, 2007.

72. Scheu testified that he did not receive a response from Raclin to his letter.[230] He also stated that he "got the silent treatment" from Hanson after the letter was sent.[231] He testified that the February 19, 2007 one-on-one meeting was the last he had with Hanson.[232]

73. On March 2, 2007, Scheu sent Kude an email, on which he copied Hanson, Fischmann, and Ruble, regarding the failed loading of telescoping in Long Beach.[233] On March 13,

---

percent failure rate? A. Right. I mentioned that along with the fact that I didn't think we were ready to roll out the product, that we were still in what I considered a beta stage of the product").

[226]*Id.* at 160:5–8.

[227]Exh. 25.

[228]RT Day 1 at 162:8–9.

[229]*Id.* at 162:21–25, 163:1 ("Q. And therefore, you never informed Mr. Hanson as of that date of any specific number, specific estimate as to how frequently telescoping was not working, did you? A. I informed him that it wasn't working, that we had problems with telescoping. The percentage we didn't know. We just knew we had a problem").

[230]RT Day 1 at 86:18–20.

[231]*Id.* at 86:21–23.

[232]*Id.* at 87:1–3.

[233]Pl.'s Exh. 12.

2007, Fischmann sent an email to unspecified recipients, including Scheu, asking that the recipients aid in testing the telescoping software.[234]  Scheu testified that these two emails "accurately reflect[ed] the discussion . . . [he] had with . . . Fischmann [concerning] the failure rate of Navic."[235]

74.  Scheu testified that, after these emails were exchanged, he attempted to discuss their substance with Hanson.  Hanson asked that he work with Welsh to resolve the issue.[236]  Scheu told Welsh he "was very concerned that there was no way to credit back advertisers because of [Navic's] failure rate. . . ."  Welsh purportedly responded that Hanson "had known about it for a year."[237]  At approximately this time, Scheu asked Welsh if Hanson was "mad at him."[238]

75.  On Monday March 5, 2007, Gail Scott wrote an email to her direct superior, Abby Pfieffer, the vice-president for human resources, attaching for Pfieffer's approval a formal description of certain changes in Hanson's department.  These included the elimination of Scheu's position.  The email noted that Scott and Pfieffer had discussed the changes "last

_____

[234]*Id.*

[235]RT Day 1 at 80:18–24.

[236]*Id.* at 81:2–9.  Welsh was responsible because it was his job "[t]o work out any technical issues or technical problems that the Navic technology was having."  (*Id.* at 81:11–12.)  Scheu's testimony that he spoke with Hanson after the email exchange appears to contradict his later statement that he did not speak with Hanson about his concerns after sending the February 24, 2007 letter.  (See, e.g., *id.* at 91:17–20 ("Q. So when you wrote your February letter to the chief compliance officer, did you then have an opportunity to communicate once again with Mr. Hanson?  A. After February 24th, no, I did not").

[237]*Id.* at 81:16–22.

[238]RT Day 2 at 12–15 ("Well, he did want to know if Derek was mad at him.  And I told him – he mentioned that Derek was not responsive, and he wanted to know if Derek was mad at him.  And I said I don't know.  You got to talk to Derek").

1    week."[239]

2    76.    On March 7, 2007, Scheu sent a letter to Jim Heneghan, Charter's senior vice president.[240]

3    Scheu had recently met Heneghan at the conference in Las Vegas, Nevada, and had

4    "touched on Navic" during their conversation.[241]   The letter did not attempt to report the

5    failure rate or contention rate to Heneghan.   The first of two pages discussed Internet

6    banner advertising and the need for guidance as to when Charter could begin selling such

7    advertising.[242]   The letter stated that Scheu had "not had a 1 on 1 discussion with Derek

8    in 2 weeks," that "[s]ome of the emails [he sent] to Derek [had not gotten] a response. . . ,

9    and that "[i]t ha[d] been a real challenge moving [banner advertising] forward."[243]   The

10   letter does not speculate as to why Hanson had ceased holding one-on-one meetings with

11   Scheu.   Half of the second page of the letter is devoted to describing deals that were

12   purportedly on the verge of closing.   Although the transactions with Nielsen, Intel, and

13   ValueClick that are mentioned appear to involve Navic, Navic is neither referenced or

14   described.[244]   The letter notes that Hanson had not yet given Scheu his MBOs and that he

---

[239]Exh. 35; RT Day 3 at 14:19–25, 15:1–4 ("What changes had you spoken to Ms. Pfieffer about the week before?  A. The positions that were listed below.  So the changes in the leadership for the Central California area, and we had a little bit of restructuring in the Los Angeles key market area, which affected one of the assistants, and then the elimination of Dean's position").

[240]Pl.'s Exh. 21.

[241]RT Day 1 at 92:15–24.

[242]Pl.'s Exh. 21 ("Associates have been asking me – When can we sell this product?  This is where I need your guidance and help.  How do you propose we move forward with this product?").  See also RT Day 1 at 93:6–12 ("I was working on launching a new product at the time with 247 Media, which was the sale of banner advertising.  We had just signed, I believe it was a three-year agreement to resell Internet advertising.  So that was one of the projects I was working on along with another company like 247.  I was working with Double Click, and I was doing a lot of work with our attorneys at that time").

[243]Pl.'s Exh. 21.

[244]Id.

1   had not received his compensation package in writing and asked for Heneghan's help.[245]

2   77.  After sending this March 7, 2007 letter, Scheu emailed Hanson.  Hanson did not reply.[246]

3        Scheu communicated with Welsh because Charter was close to launching a project with

4        Chase Manhattan Bank, and he was concerned about its success given the Navic

5        functionality problems.[247]  Scheu said that Welsh told him "the issues regarding telescoping

6        . . . was a function that we couldn't fix per Navic.  It was a function of the cable system

7        itself."[248]  He stated that he reiterated the need to credit back advertisers and Welsh said

8        that such a "system and process [did] not exist."  Scheu testified that he then said: "Well,

9        that's illegal.  That's deceptive advertising.  You're basically taking somebody's money

10       and not crediting them back."  Welsh reportedly responded: "That's a sales issue.  Discuss

11       it with Derek Hanson."   By that time, however, Scheu and Hanson were not

12       communicating.[249]

13  78.  On March 22, 2007, Scheu sent a second letter to Raclin.  He recounted the history of

14       Navic and said that he was "just very concerned about misleading our advertisers at this

15       point."[250]  He advised Raclin that "[b]ased on current field reports the Navic [ ] technology

16       is not working at 100% as of this date.  Feedback from operations is that even if Navic

17       [were] working at 100%, our system is not capable of handling all the telescoping streams.

18       . . .  I have received estimates of between 20% on the low end and as high as 30%

---

20  [245]*Id.*

21  [246]*Id.* at 95:16–20.

22  [247]*Id.* at 96:4–9.  Chase Manhattan had committed to a $150,000 advertising schedule that
23  involved telescoping.  (*Id.* at 96:19–24.)

24  [248]*Id.* at 97:13–15.

25  [249]*Id.* at 97:18–25, 98:1.  Scheu testified that he had earlier spoken with Welsh about the
26  fact that the failure to credit back to advertisers was "illegal" at the end of 2006 or January 2007.
    He further testified that he had raised the possibility of "legal exposure" due to Navic's non-
27  functionality with Hanson in January 2007 or the last quarter of 2006.  (*Id.* at 99:2–17.)

28  [250]Pl.'s Exh. 22.

53

[regarding the number of times] the telescoping feature will not work. This would mean that 1 our of every 5 persons (20%) who tries to telescope will not be able to do so." Scheu also stated that he had "not communicated this problem . . . to advertisers/clients and I'm sure this has not been communicated to local advertisers." He cautioned that "[u]nlike our billing systems for our traditional 30 second business [where] we can tell when a spot does not air or has had a technical error [and] then reflect[ ] [this fact] in the billing system and [ ] credit adjustments to the client[,] [w]e have no such system in place or any[ ]way of knowing if a consumer cannot telescope." Scheu concluded that "[i]f we run advertising schedules for clients that utilize telescoping for a campaign and do not tell them that only 66-80% of the feature works this I feel opens us up for legal exposure."[251] Scheu testified that it was "around th[e] time frame" of this letter that he first learned the 20–30% figure.[252]

79. Raclin testified that he could not specifically recall receiving the March 22, 2007 letter. He said that his standard practice, however, was that upon receiving a follow-up communication, he referred the communication to the person investigating the earlier communication – here McMeley.[253] Raclin testified that he had never spoken with Hanson on any subject. He also stated that during the first quarter of 2007, he did not direct anyone to speak to Hanson regarding Scheu's allegations.[254]

80. Scheu testified that the "purpose of th[e] [March 22, 2007] letter was to explain how [he] felt, that the end band technology or the telescoping wasn't working." He said he "was trying to get corporate to understand that [he] couldn't communicate [his concerns] to Hanson," and thus "felt [he] had to report it according to what [employees had been] told

---

[251]*Id.*

[252]RT Day 1 at 160:5–8.

[253]RT Day 4 at 14:8–14.

[254]*Id.* at 14:17–25.

54

to do, to report it to the compliance officer."[255]  Hanson testified that he had not seen the March 22, 2007 nor been told of its existence prior to Scheu's termination.[256]

81.  Pfieffer gave final approval for Scheu's termination on Friday, March 23, 2007.[257]  Later that day, in the afternoon, Scheu stopped by Scott's office.[258]  Scheu said he felt "shut out" because various managers had ceased holding one-on-one meetings with him.[259]  Scheu told Scott he had written to Heneghan, a course of action Scott suggested was inadvisable.[260]  Scheu then began discussing Navic, and became "very animated."  He "had one foot in the doorway and one foot in [Scott's] office," and said: "Oh, there's all these problems with Navic.  And it's not working, and we're having problems."[261]  Scheu told Scott that he had spoken with Welsh about the problems, and that Welsh had said he was working

[255]RT Day 1 at 98:14–19.

[256]*Id.* at 279:6–10.

[257]Exh. 35; RT Day 3 at 17:13–16, 21:3–9.

[258]RT Day 3 at 18:10–15 ("Um, Dean would frequently stop by and catch up, how's it going.  And it was one of those.  It was a mid – it was like three or four-ish on that Friday afternoon.  And I remember it very vividly.  In fact, I took some notes after the conversation because I knew something was very odd about that entire conversation.  Just by the way he was behaving").

[259]*Id.* at 18:20–25 ("It started out that – let's see, he had the feeling of being shut out.  Somebody – one of the vice-presidents had canceled a one on one.  Hans – I think it was Craig Ruble had canceled his one on one.  Mike Szczechura had not held his regular one-on-one meetings with Dean.  And he felt that he wasn't getting any response").

[260]*Id.* at 19:12–18 ("Jim Heneghan, who is Derek's boss.  And I questioned him on that, and I asked him why he would write a letter to Jim.  I think I might have even said, you know, politically do you think that's kind of a smart move?  You know, why would you go around your boss if you haven't really fully talked to Derek?  And he said, 'I don't know, Gail.'  He said, 'Maybe Jim has a spot for me on his team'").

[261]*Id.* at 19:19–24.

on them.[262]  Scott asked Scheu if he had spoken to Hanson, and Scheu responded, in Scott's recollection: "No, I haven't talked to Derek yet."[263]  Scott asked if Todd Stewart, who worked with Navic nationwide, knew, and Scheu said that everyone knew there were problems, but that nothing was being done.[264]

82.  Scott stated that, prior to March 23, 2007, Scheu had never told her he thought Charter was making misrepresentations to advertisers.[265]

83.  On March 28, 2007, Scheu sent a letter to Christin McMeley, a deputy compliance officer at Charter.[266]  The letter stated that on March 21, 2007, Scheu had discovered the contention rate, and had, as a consequence, sent the March 22, 2007 letter to Raclin. Scheu related that he had discussed the subject in a March 26, 2007 one-on-one meeting with Welsh, and reported Welsh's response "that [the matter was] a sales issue [that he should] go over . . . with [Hanson]."[267]

---

[262]*Id.* at 19:24–25, 20:1–2 ("And I asked him if he had told anyone.  And he said yes, he talked to Mike about it.  And I said what did Mike say?  And he said Mike said they are working on it").

[263]*Id.* at 20:3–4.

[264]*Id.* at 20:5–9 ("Then I asked him if Todd Stewart knew, because Todd is over the entire, you know, nation for this particular product, and he said everyone knew that there were problems, but there didn't seem to be anything being done, but everybody knew"); see also *id.* at 38:2–8 ("None of the conversations that I had with Dean were positioned to be formal complaints, even on the 23rd when he was telling me, you know, about all the issues, and I knew something was weird about that conversation, he still stood in my doorway.  He was half in – kind of half in and half out.  Nothing was formal about that"); *id.* at 38:19–21 ("It was almost like he just did a drive-by, dumped all this stuff at my doorway, and then said oh, I'm going to take my daughter to something tonight.  See you later").

[265]RT Day 3 at:21–25, 22:1–5 ("Q. Let me be more specific.  Prior to March 23rd, did Mr. Scheu ever come to you and tell you that he thought advertisers were being misrepresented? A. No. Q.  Did he ever come back to you and tell you that he thought Charter was committing fraud with the advertisers?  A. No.  Q.  Did he ever come to you and tell you that he thought anyone at Charter was deceiving advertisers?  A. No").

[266]Exh. 25.

[267]*Id.*

56

84.    At the end of March 2007, Hanson informed Scheu that his position had been eliminated.[268]
       Scheu testified that prior to that time, Hanson had never communicated he was not
       performing at a satisfactory level.[269]  Scheu was supposed to meet with Scott immediately
       after speaking with Hanson, but he left the office and Scott was unable to meet with him.[270]
       Scott contacted Scheu later that day to provide him with  severance documentation; Scheu
       instructed her to send it to him by fax.[271]  Later, after Scheu had received the severance
       package, Scott spoke with Scheu on the telephone.  Scheu had contacted a Charter
       customer, and Scott told him to cease such activity.

85.    Scott also asked about the severance package, which Scheu described as skimpy.  He called
       Hanson a bad person,[272] and offered as an example of this fact a conversation Scott and
       Scheu had purportedly had in which Scott allegedly said that if Scheu reported that Ruble
       had paid the Napa Valley dinner bill, Scheu would be terminated.  Scott replied that she
       had never said anything of the kind, and the conversation ended.[273]  Either in this
       conversation or in a subsequent one, Scott told Scheu his termination was on hold as a

---

[268]*Id.* at 99:22–25, 100:1–4.

[269]*Id.* at 100:15–19.

[270]RT Day 3 at 23:1–2.

[271]*Id.* at 23:6–9.

[272]*Id.* at 23:20–25, 24:1–4 ("It was – so he had received the documentation.  I had to talk to him about a phone call or an E-mail that we had received about a phone call that he had made. So I was asked to talk to him about not doing that any longer.  And I wanted to make sure that he was okay with the severance documentation.  And the feedback that I got from him was, you know, okay on the customer issue.  As far as the severance document, he felt that the package was skimpy, and he told me that Derek was a very bad person and that he did a lot of bad things.  And that was the conversation").

[273]*Id.* at 54:22–25, 55:1–3 ("Dean told me in a telephone call at the end of the conversation that I had with him [where] I had to talk to him about not calling the client[ ] [and] talk[ ] to him about the severance package, . . . that Derek was a bad person and did bad things.  And he said something [to the effect] that I had said that, and I said no, I didn't, and he said yes, you did, and that was the end of the phone call").

result of Scheu's allegations.[274]

86. Toward the end of March 2007 or the beginning or April 2007, Joe Molise, a deputy compliance officer at Charter, was tasked with investigating Scheu's allegations.[275] Molise commenced his investigation by reviewing Scheu's letters, consulting with other members of the compliance committee, gathering any facts already obtained, and speaking with various employees who had responsibility for the technology in question.[276] Molise then conducted a search of employees' corporate email accounts to look for keywords related to Navic.[277] He interviewed Fischmann and two account executives, Lisa Behr and Phil

---

[274]*Id.* at 25:17–23 ("I believe I did. I don't know if it's part of the same conversation that I referenced just a few minutes ago, but I did have a conversation with him where, you know, I told him that he was not – his termination would be on hold; however, his position was still eliminated, but that he did not need to report to the office, and that this was – his termination was pending this investigation"); *id.* at 80:2–13 ("Because it was your understanding that the investigation that was undertaken was with respect to whether or not Mr. Scheu's concerns regarding Navic and what Charter was telling its customers were in fact correct, accurate, or inaccurate; right? A. I think the investigation was that we had taken – he had made a report, and because of that report, there was retaliatory action, something to that effect. And so that's what was occurring. It wasn't to find out if his termination – his position was still eliminated. What I'm having trouble with is even during that time of the investigation, his position was eliminated"); *id.* at 80:19–25 ("Q. What was your understanding of the investigation? A. That Dean had made some claims at a pretty high level about us misrepresenting a product or technology and that they were, you know, he had made the claim at a pretty high level and that he may have been fired as a result of that. And so the investigation was taking place to look into his claim").

[275]RT Day 4 at 30:14–16.

[276]*Id.* at 33:3–12 ("So the first thing I did was review these letters, I guess, in answer to your last question. I reviewed these letters. I had a direct conversation with the three members of the compliance committee who had handed off the investigation to me and requested that I conduct an investigation. Gathered facts that they had obtained. I then spoke with a few members of corporate and regional or local staff within Charter who had various ranges of responsibilities for the business process and technology in question. So that included at the corporate level, I guess, going from start to finish, it started with Jim Heneghan, who was the head of ad sales for the company. And Glenn Leech, who, if I recall, I believe he was actually corporate staff, but [I] gathered facts from him about the technology in question, interactive advertising, the specific technology in question, which was the Navic telescoping product").

[277]*Id.* at 33:24–25, 34:1.

Berquam, who had been interacting with advertisers and had therefore sold or leveraged Navic.[278] Molise also interviewed a couple of advertising customers who were using the product.[279] He reviewed the contracts or statements of work for Navic services that existed for the five companies then using Navic.[280]

87. Molise concluded that Navic was "in the very early stage of development," with only five accounts using the technology.[281] He further concluded that Charter had made no representations to customers that were in the nature of performance or level of service guarantees.[282] By interviewing both Charter sales executives and advertiser representatives, he established that both sides understood that advertisers "weren't paying for the service and that the customers understood fully that [Charter was] in the early deployment stage and [that they] were effectively beta customers for the technology and were happy to be participating in the program and using the technology."[283] As a result, Molise concluded that "there really was no basis for the allegations that Charter was misrepresenting its level of service for this product."[284]

88. Molise did not interview Scheu because he believed that Scheu had been interviewed by other members of the compliance committee and because his letters provided sufficient input regarding his view.[285] Molise did not interview Hanson because he was focused on investigating the technology and its deployment, identifying what representations had been

[278] *Id.* at 34:1–6, 18–24.

[279] *Id.* at 34:6–9.

[280] *Id.* at 40:4–7.

[281] *Id.* at 40:13–19.

[282] *Id.* at 40:20–25.

[283] *Id.* at 41:1–5.

[284] *Id.* at 41:17–19.

[285] *Id.* at 36:1–10.

made to customers, and determining how customers understood Charter's commitment. He did not believe Hanson was in possession of any of this information.[286] Upon completion of that investigation, Scott sent a formal letter of termination to Scheu on April 12, 2007.[287]

89. At the time of Scheu's employment, Charter had a "corrective action process," which was included in the employee handbook.[288] Under the corrective action process, an employee was to receive written notification be any deficiencies. Hanson did not give Scheu written notification of his deficiencies.[289]

90. After Scheu's termination, Hanson became involved in negotiations to have Time-Warner take over advertising sales for Charter in the Los Angeles market. Hanson was asked to go to work for Time-Warner managing the resulting organization.[290] Following execution of the agreement, Time-Warner has sold advertising for Charter across the Los Angeles market.[291] Fischmann went to work for the resulting organization as well. With the exception of Welsh, all other employees who reported to Hanson were neither retained by

---

[286]*Id.* at 36:20–25, 37:1–2.

[287]Exh. 31; RT Day 3 at 26:9–13.

[288]RT Day 1 at 217:17–20, Exh. 45 ("Employee Handbook") at 33.

[289]*Id.* at 218:6–19. See also RT Day 3 at 65:11–17 ("Q. Okay. So the first step in corrective action was a verbal warning; right? A. Verbal coaching in most cases. Q. And the second step was a written warning; correct? A. It could go from several – one or several verbal coaching discussions to a written formalized documented discussion, if you will. Q. And then the next step was a final warning; correct? A. Could be, yes"); *id.* at 66:2–5 ("Q. Okay. And with respect to Dean Scheu's personnel file, in fact there are no written warnings regarding his performance; right? A. Not that I'm aware of").

[290]*Id.* at 276:3–11 ("Yeah, during my – up until the time I left Charter Communications, I was involved in a negotiation to have Time-Warmer take over representation for the ad sales duties for Charter properties in the Los Angeles market. And during that time, we had come to terms on what that transaction would look like, and as I mentioned before, during that process they had – Time-Warmer asked me to become a part of the Time-Warmer companies in managing what would be the resultant organization").

[291]*Id.* at 276:19–22.

60

Charter or employed by Time-Warner.[292] Charter offered Welsh a severance package, given that the department in which he worked was being eliminated. He was then offered a position in a different part of the company, however.[293]

91. Scheu testified that following his termination he made efforts to obtain a new job, but was only able to obtain certain short-term consulting jobs for the next several years.

## II. CONCLUSIONS OF LAW

### A. Standard Governing Wrongful Termination in Violation of Public Policy (*Tameny* Claim)

92. California law recognizes a claim for wrongful termination in violation of a public policy reflected in a statute or constitutional provision. *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 172 (1980) ("In a series of cases arising out of a variety of factual settings in which a discharge clearly violated an express statutory objective or undermined a firmly established principle of public policy, courts have recognized that an employer's traditional broad authority to discharge an at-will employee 'may be limited by statute . . . or by considerations of public policy'" (citations omitted));[294] see also *Kelly v. Methodist*

---

[292]*Id*. at 278:8–18.

[293]RT Day 2 at 85:2–5.

[294]In *Tameny*, an employee was discharged for his refusal to violate a penal statute. In upholding the claim, the California Supreme Court explained that the cause of action was not dependent on an express or implied promise in the employment contract, "but rather reflect[ed] a duty imposed by law upon all employers in order to implement the fundamental public policies embodied in the state's penal statutes." *Tameny*, 27 Cal.3d at 176. Tort remedies are available, the Court held, when the "employer's discharge of an employee contravenes the dictates of public policy." *Id*. at 177.

In *Koehrer v. Superior Court*, 181 Cal.App.3d 1155 (1986), the California appellate court provided further explication of the *Tameny* ruling:

"As *Tameny* explained, the theoretical reason for labeling the discharge wrongful in such cases is not based on the terms and conditions of the contract, but rather arises out of a duty implied in law on the part of the employer to conduct its affairs in compliance with public policy. . . . [T]here is no logical basis to distinguish in cases of wrongful termination for reasons violative of fundamental principles of

*Hospital of Southern California*, 22 Cal.4th 1108, 1112 (2000) ("*Tameny* claims permit wrongful termination damages when a termination is undertaken in violation of a fundamental, substantial and well-established public policy of state law grounded in a statute or constitutional provision"); *Gantt v. Sentry Insurance*, 1 Cal.4th 1083, 1094-95 (1992) (same), disapproved on other grounds in *Green v. Ralee Engineering Co.*, 19 Cal.4th 66 (1998).

93.    A plaintiff asserting a *Tameny* claim need not exhaust administrative remedies. See, e.g., *Rojo v. Kliger*, 52 Cal.3d 65, 88 (1990) ("[A]lthough an employee must exhaust the FEHA administrative remedy before bringing suit on a cause of action under the act or seeking the relief provided therein, exhaustion is not required before filing a civil action for damages alleging nonstatutory causes of action. An employee . . . may elect to waive the statutory cause of action and remedies, and proceed directly to court on the common law claims. . . ; alternatively, the employee may pursue both the administrative and the judicial avenues, either sequentially . . . or simultaneously. . ." (citations omitted)); *Walrath v. Sprinkel*, 99 Cal.App.4th 1237, 1242 (2002) ("Appellant also contends that his cause of

---

public policy between situations in which the employee is an at-will employee and [those] in which the employee has a contract for a specified term. The tort is independent of the term of employment." *Id.* at 1166.

A *Tameny* action, therefore, is best characterized as "'ex delicto,' or arising 'from a breach of duty growing out of the contract,' rather than 'from a breach of a promise set forth in the contract' or 'ex contractu.'" *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 667–68 (1988) (quoting *Tameny*, 27 Cal.3d at 175). *Tameny* confronted the fact that no statute specifically barred an employer from terminating an employee who had refused to act illegally, and considered whether, absent an express prohibition of the reason for discharge, the action could proceed. The California Supreme Court concluded that

"even in the absence of an explicit statutory provision prohibiting the discharge of a worker on such grounds, fundamental principles of public policy and adherence to the objectives underlying the state's penal statutes require the recognition of a rule barring an employer from discharging an employee who has simply complied with his legal duty and has refused to commit an illegal act." *Tameny*, 27 Cal.3d at 174 (footnote omitted).

For this reason, the *Tameny* doctrine has been characterized as an "exception to the at-will employment doctrine." See, e.g., *Phillips v. Gemini Moving Specialists* 63 Cal.App.4th 563, 570 (1998).

action is not barred by the failure to exhaust administrative remedies because *Rojo v. Kliger* . . . makes it clear that the exhaustion rule does not apply to common law causes of action for wrongful discharge in contravention of public policy. . . . Appellant does appear to have pleaded a common law cause of action for wrongful discharge in violation of the public policy in FEHA against retaliation, which is outside the scope of the exhaustion-of-administrative-remedies rule"), disapproved on other grounds in *Jones v. Lodge at Torrey Pines Partnership*, 42 Cal.4th 1158 (2008); *Leibert v. Transworld Systems, Inc.*, 32 Cal.App.4th 1693, 1706 (1995) ("We conclude that appellant's *Tameny* claim, premised as it is upon violation of [Labor Code §§] 1101, 1102, 1102.1, is not barred for failure to exhaust administrative remedies. It is well established that a *Tameny* claim is a nonstatutory, common law claim sounding in tort. . . . In our view, the rationale of the *Tameny* claim would be undermined if a violation of a fundamental public policy of the state had to remain unredressed simply because a plaintiff failed to pursue nonexclusive administrative remedies. Respondent advances no reason, and we discern none (other than possible economic and public policy concerns more appropriately left to the Legislature), why this nonstatutory, tort cause of action should be treated differently than other nonstatutory claims for purposes of application of the exhaustion doctrine").

94. California courts have recognized at least four circumstances in which the termination of employment may violate public policy: where "the employee (1) refused to violate a statute; (2) performed a statutory obligation; (3) exercised a constitutional or statutory right or privilege; or (4) reported a statutory violation for the public's benefit." *Green*, 19 Cal.4th at 76.[295] Plaintiff bears the burden of identifying the specific statute(s) or constitutional provision(s) on which he bases his *Tameny* claim. *Id.* at 83 ("[I]n wrongful

---

[295]"However, the tort of wrongful discharge in violation of public policy is not limited to these four categories," *Phillips v. Gemini Moving Specialists*, 63 Cal.App.4th 563, 570 (1998) (citing *Gould v. Maryland Sound Industries, Inc.*, 31 Cal.App.4th 1137, 1147 (1995)), and will lie "wherever the basis of the discharge contravenes a fundamental public policy." *Soules v. Cadam, Inc.*, 2 Cal.App.4th 390, 401 (1991), disapproved on other grounds in *Turner v. Anheuser-Busch, Inc.*, 7 Cal.4th 1238 (1994).

termination cases we have rejected public policy claims that were 'largely unaccompanied by citations to specific statutory or constitutional provisions.' We observed that the omission 'puts [the defendant] and the court in the position of having to guess at the nature of the public policies involved, if any. This kind of showing is plainly insufficient to create an issue of *material* fact justifying a trial on the merits of [the plaintiff's] claims,'" quoting *Turner*, 7 Cal.4th at 1257 (dismissing an action premised on vague references to "the Alcohol, Tobacco and Firearms laws")).

95. In *Gantt*, the California Supreme Court held that a *Tameny* claim must be grounded in a statute or constitutional provision that evidences the public policy in question. The Court declined to recognize wrongful termination claims based on public policy articulated in administrative rules, regulations and decisions, and in judicial decisions. *Gantt*, 1 Cal.4th at 1089-95. See also *Stevenson v. Superior Court*, 16 Cal.4th 880, 889 (1997) ("In the context of a tort claim for wrongful discharge, tethering public policy to specific constitutional or statutory provisions serves not only to avoid judicial interference with the legislative domain, but also to ensure that employers have adequate notice of the conduct that will subject them to tort liability to the employees they discharge").[296]

96. July 26, 2011Scheu contends that his case against Charter falls under the first of the four previously recognized categories. Specifically, he asserts that he was wrongfully terminated because he refused to violate California Business and Professions Code § 17200 by engaging in the unfair business practice of misleading advertisers, and refused to

---

[296]In *Green*, 19 Cal.4th 66, the California Supreme Court clarified *Gantt*. The Court held that *Tameny* claims are limited to claims "finding support in an important public policy based on a statutory or constitutional provision." *Id*. at 80. It concluded, however, that "if a statute that seeks to further a public policy objective delegates the authority to adopt administrative regulations to an administrative agency in order to fulfill that objective, and that agency adopts regulations that are within the scope of its statutory authority and effectuate the statutory policy, then those regulations may be manifestations of important public policy." *Id*. at 82. Thus, the Court held that regulations implementing the Federal Aviation Act of 1958 by promoting proper manufacture and inspection of component airline parts were a source of fundamental public policy that limited an employer's right to discharge at-will employee. *Id*. at 79–80.

participate in an activity that violated a state or federal statute, or failed to comply with a state or federal regulation as prohibited by California Labor Code § 1102.5(c).

97. Where a statutory violation has been asserted, the court "must still inquire whether the discharge is against public policy and affects a duty which inures to the benefit of the public at large rather than to a particular employer or employee. For example, many statutes simply regulate conduct between private individuals, or impose requirements whose fulfillment does not implicate fundamental public policy concerns." *Foley*, 47 Cal.3d at 669. *Tameny* held that the public policy basis for the cause of action must be "firmly established," *Tameny*, 27 Cal.3d at 172, "fundamental," *id.* at 176, and "substantial," *id.* at 177.[297] See also *Gantt*, 1 Cal.4th at 1090 ("Yet despite its broad acceptance, the principle underlying the public policy exception is more easily stated than applied. The difficulty, of course, lies in determining where and how to draw the line between claims that genuinely involve matters of public policy, and those that concern merely ordinary disputes between employer and employee. This determination depends in large part on whether the public policy alleged is sufficiently clear to provide the basis for such a potent remedy"). In deciding Charter's motion for summary judgment, the court concluded that violations of California Labor Code § 1102.5 and California Business & Professions Code § 17200 constitute public policy within the meaning of *Tameny* and its progeny.

---

[297]The essential purpose of the inquiry is "to distinguish between 'claims that genuinely involve matters of public policy, and those that concern merely ordinary disputes between employer and employee.'" *Phillips*, 63 Cal.App.4th at 670 (quoting *Gantt*, 1 Cal.4th at 1090). "[T]he policy in question must involve a matter that affects society at large rather than a purely personal or proprietary interest of the plaintiff or employer; in addition, the policy must be 'fundamental,' 'substantial' and 'well established' at the time of the discharge." *Gantt*, 1 Cal.4th at 1090). The *Foley* Court, for instance, held that while an employer may not discharge an employee for reporting possible criminal activity at his employment to law enforcement authorities, an employee may be discharged for reporting, to his employer, that a supervisor was under investigation by the Federal Bureau of Investigation for possible criminal activity at the supervisor's former job. The Court concluded the employee's report in the latter case served only the interest of the employer. *Foley*, 47 Cal.3d at 669–71.

98.     Scheu asserts that his "allegations against Charter fall into the first of the four categories delineated by the *Gantt* court, wrongful termination for refusing to violate a statute."[298] In his post-trial brief, Scheu cites several pieces of evidence that he argues show he "refused" to violate a statute. First, he cites the fact that he "voiced concern with how advertisers were being billed." Second, he notes that he "continued to express concern over how Navic was being marketed."[299] Finally, he cites the timing of Hanson's decision to terminate him, arguing that it is suspiciously close to the date he sent a letter to Raclin regarding the Napa Valley dinner and representations Hanson had made to the chief operations officer.[300] Although not explicit, Scheu appears to imply that the February 24, 2007 letter to Raclin is evidence of his refusal.

---

[298]Plaintiff Dean Scheu's Closing Brief ("Pl.'s Brief"), Docket No. 82 (June 25, 2010) at 16. This is the only theory of liability preserved in the final pretrial conference order. (Final Pretrial Conference Order, Docket No. 64 (May 11, 2010) at 5 (stating that an element of plaintiff's claim was "[t]hat Plaintiff's refusal to engage in fraudulent advertising was a motivating reason for [his] discharge") Because it is the only theory articulated in the pretrial conference order and the only theory advanced in Scheu's closing brief, the court will only consider the sufficiency of Scheu's argument that he was terminated because he refused to violate a statute. It will not consider whether Scheu proved that he was wrongfully terminated because he performed a statutory obligation; exercised a constitutional or statutory right or privilege; or reported a statutory violation for the public's benefit. See *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948, 950 (9th Cir. 1993) ("A pretrial order generally supersedes the pleadings, and the parties are bound by its contents"); *DP Aviation v. Smiths Industries Aerospace and Defense Systems Ltd.*, 268 F.3d 829, 842 n. 8 (9th Cir. 2001) ("We follow this rule here by looking to the pretrial order in determining the scope of the claims presented"). Specifically, Scheu did not preserve an argument that he was terminated because he reported a statutory violation for the public's benefit. See *Collier v. Superior Court*, 228 Cal.App.3d 1117, 1123 (1991) ("[Section 1102.5(b)], which prohibits employer retaliation against an employee who reports a reasonably suspected violation of the law to a government or law enforcement agency, reflects the broad public policy interest in encouraging workplace 'whistleblowers,' who may without fear of retaliation report concerns regarding an employer's illegal conduct. . . . Even though the statute addresses employee reports to public agencies rather than to the employer and thus does not provide direct protection to petitioner in this case, it does evince a strong public interest in encouraging employee reports of illegal activity in the workplace" (citations omitted)).

[299]Pl.'s Brief at 21.

[300]*Id.* at 22.

**B.    Whether Scheu Proved by a Preponderance of the Evidence that He Refused to Engage in Activity that Violated a Statute**

99.    Scheu failed to proffer any evidence that he "refused" to participate in an act that violated a statute.  Raising concerns about certain practices does not rise to the level of refusal.  Perhaps because the meaning of the term is obvious, the case law does not define "refuse."  It accords the term its plain meaning, however – that an employee asked to perform an act stated that he would not perform the act and/or did not perform the act.  In *Tameny*, for example, plaintiff's employer increasingly pressured plaintiff to threaten Atlantic Richfield franchisees with forced reductions in the gasoline prices they could charge.  Plaintiff refused to do so, and was warned that he would be discharged if he did not.  When he did not heed this warning, he was terminated.  *Tameny*, 27 Cal.3d at 171.  Similarly, in *Haney v. Aramark Uniform Services, Inc.*, 121 Cal.App.4th 623 (2004), Aramark had a business practice of expressly instructing route sales representatives, including plaintiff, to charge customers for certain bathroom supplies they did not require or receive and to bring unused items back to the plant and place them in a "clean return cart" so they could be resold.  *Id.* at 630.  The court held that plaintiff's refusal to engage in the fraudulent practice was sufficient to state a *Tameny* claim.  *Id.* at 643-44.

100.    Scheu adduced no proof that he refused to perform an act that Charter asked him to do.  The evidence show that in late 2006, Scheu was asked to increase his role in sales, and he complied.  Scheu testified that he reported some concerns regarding the functionality of Navic to his supervisors.  He did not state, however, that he objected or refused to go on sales calls or to make a particular sales presentation requested by Charter.

101.    Significantly, when asked by his counsel whether he expressed concern that Navic's functionality problems were not being communicated to advertisers, Scheu did not respond directly.  Although he said that he had such a concern, he did not say he expressed it to

Hanson.[301]  When his attorney asked a second time whether he had communicated to Hanson his concern about "misrepresenting . . . Navic to [ ] customers," Scheu responded that he conveyed that the product was "not in the launch phase" but "probably more in a beta stage."  Once again, he did not say that he told Hanson he felt Charter was misrepresenting the capabilities of the product.[302]  When his attorney asked whether Hanson had ever directed him to misrepresent Navic's stage of development, Scheu stated that Hanson "didn't say one way or another."[303]  Although Scheu testified that he was pressured to increase sales, he specifically testified that no one ever directed him to make a misrepresentation to an advertiser.[304]  Indeed, in response to careful questioning by his counsel, Scheu stated that he was "not told" that it was acceptable for him to tell advertisers that Navic had a failure rate.[305]  He did not testify he was affirmatively told that he could not make such a statement.

---

[301]*Id.* at 65:20–25, 66:1–6 ("Q.  Did there come a point in time when you discussed with Mr. Hanson your concern about the contention issues and the representations that the company was making to its prospective customers?  A.  I was very concerned all the time that we were out there misrepresenting technology that worked a hundred percent when it didn't and especially when you're talking about salespeople that are very far removed from the chain of what's working and what's not working.  They really don't have an idea because only us in the division level or upper management really knows what the problems are").

[302]*Id.* at 68:21–25, 69:1–3 ("Q.  Did there come a point in time where you actually informed Mr. Hanson that you were concerned that the company was misrepresenting the value of Navic to its customers?  A.  I had a concern that I spoke to him towards the end of 2006, especially when I was going out there – when he asked me to go out there and sell to advertisers.  I conveyed to him that I felt that we were still not in the launch phase of the product, but we were really probably more in a beta stage").

[303]*Id.* at 69:12–15 ("Q.  Well, did Mr. Hanson ever tell you that you were not to inform potential customers that you were in the experimental stages?  A.  No, he didn't say one way or another").

[304]RT Day 1 at 114:9–14 ("Q.  No one informed you, Mr. Scheu, no one directed you, I should say, excuse me, to misrepresent to advertisers the capabilities of Navic; correct? A.  No one directed me?  Q.  To make a misrepresentation to an advertiser; correct? A.  Correct").

[305]*Id.* at 91:6-8.

102. Scheu's deposition testimony was consistent. Scheu stated that he could not recall communicating anything "to Derek Hanson about . . . possible misrepresentation of Navic's abilities to advertisers."[306] During cross-examination at trial, Scheu asserted it was "not true" that he had never informed Hanson that he "refused to misrepresent Navic's capabilities to advertisers."[307] He contended his recollection was better at trial than during his deposition because he had reviewed unspecified documentation. This testimony was unpersuasive, since Scheu also stated that there was no document that evidenced an occasion on which he told Hanson that he refused to misrepresent Navic's capabilities.[308] Hanson testified that he had encouraged Scheu to promote Navic and "[Scheu] never raised any objection to that."[309] Hanson also stated that Scheu never said he believed Charter was misrepresenting Navic's functionality.[310] Welsh too testified that Scheu never said he felt Charter was misrepresenting Navic's functionality to advertisers.[311]

103. Scheu stated that early in 2007, he became "more vocal" in his concerns after Hanson told him to keep selling Navic and keep representing that the product was "functional." He did not testify, however, that he was told to represent that Navic was error-free, and other than stating that he expressed concerns about the product's functionality, Scheu did not

---

[306]*Id.* at 114:21–25; Scheu Depo. at 208:13–16 ("QUESTION: What can you recall, if anything, as to what you spoke to Derek Hanson about concerning possible misrepresentation of Navic's abilities to advertisers? ANSWER: I don't recall").

[307]RT Day 1 at 114:15–17.

[308]*Id.* at 115:4–21.

[309]*Id.* at 215:6–9.

[310]*Id.* at 261:11–15 ("Q. At any point in time ever during Mr. Scheu's employment at Charter, did he ever raise with you that he felt Charter was misrepresenting Navic to its – to advertisers or potential advertisers? A. He never raised that point to me").

[311]RT Day 2 at 80:4–6 ("Q. Did Mr. Scheu ever complain to you that he felt Charter was misrepresenting advertisers? A. I don't believe so, no").

testify that he refused or ceased to represent that Navic was functional.[312]  Indeed, he expressly stated that he never told advertisers Navic was fully functional,[313] and never changed his sales pitch in any way.[314]

104.   Scheu stated that after a particular sales call, he advised Welsh that he had "start[ed] to feel [an] ethical responsibility to the customers."[315]  He did not state, however, that he refused to continue making sales calls.  Even if the court were to view the evidence in the light most favorable to Scheu, therefore, it shows at most that he was reporting concerns and feeling ethical qualms.  There is no evidence that he refused to make sales calls or that he refused to make specific representations to advertisers.  Rather, the evidence indicates that Scheu was never directed to misrepresent the functionality of Navic, that he continued to make sales calls, and that he never represented that Navic was fully functional.

105.   More fundamentally, Scheu's testimony lacked credibility.  It was inconsistent on key points (e.g., testimony that he raised the 20-30% contention rate with Hanson on February 19, 2007, and later testimony that he first learned about the 20-30% rate in the March 21, 2007 time frame), frequently vague, and often non-responsive.

---

[312]RT day 1 at 72:1–11 ("Q. Did Mr. Hanson tell you to continue selling?  A. Yes, he did. Q. Did he tell you to continue representing Navic was functional?  A. Yes, he did.  Q. And did you express concerns to Mr. Welsh about Mr. Hanson's directions?  A. I believe there were conversations we had, certainly in the first quarter of 2007, where I started to become more vocal").

[313]Id. at 63:11–16.

[314]See also RT Day 1 at 116:9–19 ("Q. You pitched advertisers on the potential use of Navic; right?  A. Correct.  Q. You pitched Intel?  A. Um-hm.  Q. Is that a 'yes'?  A. Yes, I did. Q. You pitched Nielsen?  A. Right.  Q. You pitched Chase?  A. Correct.  Q. Before Mr. Hanson informed you of your termination, you never had informed any advertiser about any concerns you had with Navic's performance; correct?  A. That's correct.  Q. You also never informed any advertisers of any concern you may have had with regard to the Bandwidth constraints that may have limited access to Navic; correct?  A. That's correct.  Q. You simply informed advertisers of the features and benefits of Navic; correct?  A. Correct.  Q. And the overall message of your presentations to advertisers and agents was that Navic worked; correct?  A. Correct").

[315]Id. at 74:4–6.

106. The fact that Scheu was not directed to misrepresent the functionality of Navic, and did not refuse to go on sales calls or to make specific representations to advertisers is further confirmed by his February 24, 2007 letter to Raclin. The letter did not report that Scheu had refused to engage in activities that his supervisors had directed him to perform. It did not object to any activity in which he had been asked to engage. It did not raise the topic of representations or misrepresentations to advertisers. It merely expressed concern that Charter's chief operating officer had received inaccurate information concerning Navic's functionality.

107. Similarly, in his March 7, 2007 letter to Heneghan, Scheu did not state that he had refused to take action that his supervisors had directed him to take, did not object to any activity in which he had been asked to engage, and did not raise the topic of representations or misrepresentations to advertisers. Rather, the letter appears to tout the fact that Scheu was about to close deals with Nielsen Entertainment and Intel.[316]

108. This interpretation of the communications is confirmed by Scheu's testimony that there is no document in which he informed anyone that he refused to misrepresent Navic's capabilities to advertisers.[317]

109. In sum, even were the court to credit Scheu's testimony in full, and even were it to accept his suggestion that Hanson decided to terminate him after he sent the February 24, 2007 letter to Raclin, and that Hanson knew about the letter when he made the termination decision, Scheu's wrongful termination claim would fail because the evidence reflects that he at no time refused to engage in any conduct, much less illegal conduct. The cause of action recognized in *Gantt* protects an employee who refuses to engage in illegal activity; not an employee who feels ethical qualms and in no way alters his behavior. As a consequence, Scheu's failure to adduce evidence that he refused to violate a statute alone requires the entry of judgment for Charter.

---

[316]Exh. 21.

[317]See RT Day 1 at 116:5–8.

**C.  Whether Scheu Proved by a Preponderance of the Evidence that His Termination Was Motivated by His Refusal to Violate a Statute**

110.  As noted, the court's conclusion that Scheu never "refused" to violate a statute is sufficient to reject his claim.  As an alternative basis for its holding, however, the court concludes that Scheu did not prove by a preponderance of the evidence that his termination was motivated by his expression of concerns regarding Navic.

111.  To prevail on a wrongful termination in violation of public policy claim, a plaintiff must establish that there exists "a causal link" between his refusal to violate a statute and the adverse employment action.  *Colarossi v. Coty US Inc.*, 97 Cal.App.4th 1142, 1152 (2002).  See also *Cuizon v. Pacific Hosp. of Valley*, No. B153896, 2007 WL 572431, * 5 n. 6 (Cal. App. Feb. 26, 2007) (stating, in a wrongful termination in violation of public policy case, that one element plaintiff must prove is a causal link between her protected activity and the adverse employment action).[318]  "'Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.'"  *Morgan v. Regents of University of California*, 88 Cal.App.4th 52, 70 (2000) (quoting *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir.1982)).

112.  The court finds that Hanson, who made the decision to terminate Scheu, did not know of the letters Scheu sent to Raclin or Heneghan at the time he decided to discharge Scheu, and likely made the decision before February 24, 2007, the date the first letter was sent.  The court finds credible testimony that Hanson, Szczechura, Holdridge, and Ruble met at Caesar's Palace on February 22, 2007, that Hanson solicited feedback on Scheu's value to the company at that time, and that he thereafter decided to terminate Scheu's employment.  The court is unpersuaded by Scheu's suggestion that the meeting did not take

---

[318]"Although the court is not bound by unpublished decisions of intermediate state courts, unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority." *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05-313 VRW, 2005 WL 2893865, *3 (N.D. Cal. Nov. 2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value")).

place because it was not listed on any formal agenda. It is entirely plausible that Hanson would take an opportunity to gather executives who otherwise worked in disparate parts of the country and hold a meeting while at a conference for another purpose.

113. The court's conclusion that Hanson did not know of the February 24, 2007 letter at the time he decided to terminate Scheu is further supported by the fact that Scheu adduced no evidence that Hanson knew about the letter or that anyone in compliance, including Raclin, told Hanson about the letter.[319]

114. As a consequence, Scheu must establish that there is a causal link between the termination decision and his purported refusal to violate a statute *prior* to the date Hanson determined to discharge him. Scheu testified that throughout 2006, he reported to various co-workers that the Navic technology was not working 100% of the time; this included "numerous conversations" that year with both Welsh and Hanson.[320] He stated that during the first quarter of 2007, he became "more vocal" in raising concerns regarding Navic's functionality with Welsh and started to develop "ethical concerns." Scheu's reference to the "first quarter of 2007"[321] does not indicate whether he raised his ethical concerns with Welsh before or after February 22, 2007. Scheu's subsequent testimony, however, that he did not raise the matter with Hanson because, at the time, they "weren't communicating" gives rise to an inference that he voiced ethical concerns *after* Hanson and Scheu returned from the Las Vegas conference. This is confirmed by the fact that Scheu

---

[319]Even assuming Hanson knew of the February 24, 2007 letter, the court reiterates that the two topics discussed in the letter were Hanson's improper request that Ruble pay for a business dinner and Hanson's allegedly false representation to Charter's chief operating officer. Had either or both of these issues been a motivating factor for Scheu's termination, Scheu still would not have established a causal link between his termination and his refusal to violate a statute. Scheu, moreover, made no argument and proffered no legal support for the proposition that it violates public policy to terminate an employee who reports that his superior failed to follow company reimbursement policies or falsely represented facts to a corporate officer.

[320]RT Day 1 at 59:7–11.

[321]*Id.* at 72:1–14.

73

testified that the February 19, 2007 one-on-one meeting was the last he had with Hanson.[322] As a consequence, it appears that Scheu began to raise ethical concerns only *after* Hanson made the decision to terminate.

115.     Scheu initially testified that he "mentioned" the 20–30% contention rate at his February 19, 2007 one-on-one meeting.[323] He later contradicted himself, stating that he first learned of figure around March 21, 2007.[324] Scheu's March 28, 2007 letter also contradicts the testimony, in that it states Scheu learned of the figure on March 21, 2007.[325] Finally, Scheu testified on cross examination that prior to March 21, 2007, he "didn't have a concrete number in mind."[326] He ultimately admitted, in fact, that he "didn't know" the percentage contention rate at the time of the February 19, 2007 meeting.[327] Scheu did not state that Navic's functionality was otherwise discussed during the meeting. As a consequence, the court concludes that Scheu and Hanson did not discuss Navic's functionality, Scheu's concerns about it, or any refusal on Scheu's part to represent that the product was fully functional at their last one-on-one meeting on February 19, 2007.

116.     The evidence similarly does not support any suggestion that, before Hanson decided to terminate Scheu's employment, Scheu raised the issue of crediting back advertisers with him and Welsh. Scheu testified that by the time he developed this concern, Hanson

[322]*Id.* at 86:21–23.

[323]RT Day 1 at 87:4–10 ("Q. During that meeting, did you discuss with Mr. Hanson your concerns regarding the representations that Navic was functional when it fact it had a 20 to 30 percent failure rate? A. Right. I mentioned that along with the fact that I didn't think we were ready to roll out the product, that we were still in what I considered a beta stage of the product").

[324]*Id.* at 160:5–8.

[325]Exh. 25.

[326]RT Day 1 at 162:8–9.

[327]*Id.* at 162:21–25, 163:1 ("Q. And therefore, you never informed Mr. Hanson as of that date of any specific number, specific estimate as to how frequently telescoping was not working, did you? A. I informed him that it wasn't working, that we had problems with telescoping. The percentage we didn't know. We just knew we had a problem").

74

"wasn't communicating with" Scheu.[328] Scheu did not raise the issue in the February 24, 2007 letter to Raclin, and tied his concern regarding crediting back advertisers to his discovery of the contention rate,[329] once again suggesting that he voiced the concern after the decision to terminate had been made.

117. In sum, there is evidence that Scheu had been raising concerns regarding Navic's functionality throughout 2006, but that those concerns related neither to representations made to advertisers nor to the crediting of payments back to advertisers. Scheu testified that he reported functionality problems beginning in "mid-2006."[330] Given that Scheu's broad concerns about Navic's functionality had been ongoing since mid-2006, he has not demonstrated a causal link between those concerns and his termination.

118. The court notes in this regard that "mere sequence is not enough" to prove a causal link, as "that would be the classic logical fallacy of 'post hoc ergo propter hoc' (after the fact, therefore because of the fact)." *Chen v. County of Orange*, 96 Cal.App.4th 926, 932 (2002). Here, Scheu failed even to demonstrate mere sequence. Scheu adduced no evidence that prior to Hanson's decision to terminate him he raised ethical or illegality concerns. The only credible evidence on the subject he proffered indicated that he learned of the contention rate on approximately March 21, 2007, well after Hanson's decision and even after the March 5, 2007 email from Scott to Pfieffer confirming Scheu's termination. Scheu likewise adduced no evidence that he raised the issue of crediting back advertisers with Hanson prior to the time Hanson decided to discharge him. Rather, he tied his developing concerns on that score to his discovery of the contention rate. The fact that

---

[328]*Id*. at 97:25, 98:1.

[329]*Id*. at 184:9–15 ("Q. When you finally received confirmation of the true numbers, that between 20 and actually 34 percent of the time the product didn't work properly, did your concerns change dramatically at that point? A. Oh, it confirmed my worst suspicions. That we were marketing a product that had fatal flaws, and we didn't have the ability to credit back advertisers").

[330]*Id*. at 182:5–8.

communications to advertisers, the contention rate, and crediting back advertisers were not mentioned in his February 24, 2007 letter to Raclin provides at least some circumstantial evidence that Scheu was not overly troubled by those issues at that time or previously. Although Scheu asserted that he had consistently raised issues regarding Navic's functionality since mid-2006, he adduced no proof that his communications in the period preceding his termination were different in kind or character, or raised red flags about possible ethical breaches or violations of law. Additionally, Scheu adduced no evidence that Hanson threatened him, that Hanson expressed frustration with Scheu's repeated expressions of concern, or that Hanson treated similarly situated employees who did not express such concerns differently. The court therefore concludes that he failed to prove a causal link between his termination and his alleged refusal to violate a statute.

119. Indeed, there was overwhelming evidence that Scheu was terminated for reasons other than retaliation for refusal to violate a statute. As noted, nearly every Charter employee called by either party testified to significant disappointment in Scheu's performance.

120. Lorelai Kude described Scheu as "egotistical and self-serving and basically uninterested" in the department's work.[331] She also noted that Scheu did not appear interested in complying with the standard office attire. She concluded that Scheu never grasped the functionality of the Navic product, and that she questioned on an almost daily basis why he remained employed at Charter.

121. Hanson recalled being unimpressed with Scheu's first presentation. Scott recalled Hanson's disappointment and corroborated it.[332] After Scheu had been at Charter for six or seven months, Hanson told Scheu that he was not meeting expectations when it came to closing sales and understanding the technology.[333] Hanson denied Scheu a portion of his MBO bonus for the second quarter of 2006 as a result.

---

[331]RT Day 2 at 117:5–11.

[332]RT Day 1 at 243:24–25, 244:1–4; RT Day 3 at 9:25, 10:1–4.

[333]*Id.* at 245:1–15.

122. Over time, Ruble also concluded that Scheu was not working effectively with the sales team, creating a successful marketing plan, or closing sales. Ruble concluded that Scheu was arrogant and condescending.[334] Ruble found Scheu's suggestions that Charter produce adult content and partner with hard alcohol producers inappropriate. He found Scheu's treatment of subordinates inappropriate.[335]

123. Welsh found that Scheu could not understand the technical aspects of the Navic product. He also noted that Scheu behaved with an air of entitlement, noted his unusual requests for furniture and office supplies, and commented on Scheu's poor treatment of Hanson's personal assistant.

124. Overall, the testimony established not only that Scheu was widely and quickly perceived as ineffective, but also that he did not fit in with the office culture of the Charter department where he worked. Scheu failed to close sales, failed to develop an effective marketing plan, and failed fully to grasp the technology he was tasked to sell. It also established that Scheu was an employee who treated subordinates with disrespect, who exhibited arrogance and an attitude of entitlement, and who proposed somewhat bizarre business initiatives.

125. Scheu bears the ultimate burden of proving that his dismissal was motivated by retaliation for his refusal to violate a statute. The court has already concluded that Scheu failed to prove that he ever refused to violate a statute. Alternatively, even were the court to construe the fact that he raised certain concerns regarding the functionality of Navic as a refusal to engage in unfair business practices, Scheu adduced no evidence that this was the motivating reason for his termination. Indeed, Charter presented overwhelming evidence to the contrary. Scheu, therefore, did not prove that his termination was retaliatory.

---

[334]RT Day 3 at 136:17-19, 140:1-8, 140:9-25, 141:1-7.

[335]*Id.* at 136:23-139:25, 141:8-143:20.

### III.   CONCLUSION

For the reasons stated, the court finds for Charter on Scheu's wrongful termination in violation of public policy claim.  It will therefore enter a separate judgment in Charter's favor.

DATED: July 27, 2011

_Margaret M. Morrow_
_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE